UNITED STATES DISTRICT COURT
                      DISTRICT OF MINNESOTA

----------------------------------------------------------
                             )
United States of America,    )  File No. 16-CR-37
                             )          (MJD)
          Plaintiff,         )
                             )
vs.                          )  Minneapolis, Minnesota
                             )  February 11, 2016
Abdirizak Mohamed Warsame,   )  1:05 p.m.
                             )
          Defendant.         )
                             )
----------------------------------------------------------

              BEFORE THE HONORABLE MICHAEL J. DAVIS
               UNITED STATES DISTRICT COURT JUDGE

                   **(CHANGE OF PLEA HEARING)**


APPEARANCES
  For the Plaintiff:          U.S. Attorney's Office
                              ANDREW R. WINTER, AUSA
                              JOHN DOCHERTY, AUSA
                              600 U.S. Courthouse
                              300 South Fourth Street
                              Minneapolis, Minnesota 55415

  For the Defendant:          Sicoli Law, Ltd.
                              ROBERT D. SICOLI, ESQ.
                              Suite 2350
                              333 South Seventh Street
                              Minneapolis, Minnesota 55402

  Court Reporter:             LORI A. SIMPSON, RMR-CRR
                              1005 U.S. Courthouse
                              300 South Fourth Street
                              Minneapolis, Minnesota 55415




     Proceedings recorded by mechanical stenography;
transcript produced by computer.

1              **P R O C E E D I N G S**

2                     **IN OPEN COURT**

3        (Defendant present)

4              THE COURT:  Let's call this matter.

5              THE CLERK:  United States of America vs. Abdirizak

6    Mohamed Warsame, Criminal Case No. 16-CR-37.  Counsel, will

7    you please state your appearances for the record.

8              MR. WINTER:  Good afternoon, Your Honor.  Andrew

9    Winter and John Docherty appearing on behalf of the United

10   States.

11             THE COURT:  Good afternoon.

12             MR. SICOLI:  Good afternoon, Your Honor.  Robert

13   Sicoli on behalf of Mr. Warsame.

14             THE COURT:  Good afternoon.  Please step forward

15   with your client.

16             Mr. Winter, will you go over the Plea Agreement

17   and Sentencing Stipulations for the record.

18             MR. WINTER:  Certainly, Your Honor.

19                     **EXAMINATION**

20   BY MR. WINTER:

21   Q.  Good afternoon, Mr. Warsame.

22   A.  Good afternoon.

23   Q.  In front of you is a document entitled Plea Agreement

24   and Sentencing Stipulations, correct?

25   A.  Yep.

1   Q.  And it is a seven-page document bearing your signature

2   at the end along with your attorney's signature; is that

3   correct?

4   A.  Yes.

5   Q.  And it's dated with today's date, February 11, 2016,

6   right?

7   A.  Yep.

8   Q.  So this document you've had a chance to review and you

9   feel like you understand its contents?

10  A.  Yes.

11  Q.  We're going to walk through this for the record and for

12  His Honor to make sure that that's the case.  Paragraph 1

13  underneath Plea Agreement is just titled Charge.  What this

14  says is that today you are pleading guilty to Count 1 of the

15  information, which is that separate charging document, that

16  charges you with conspiracy to provide material support and

17  resources to ISIL.  Is that what you understand is going on

18  today?

19  A.  Yes.

20  Q.  And then we've referenced the part of the federal code

21  that applies, Title 18, United States Code, Section 23 --

22           THE COURT:  Do you have an extra copy of the plea

23  agreement?

24           MR. WINTER:  Certainly.

25  BY MR. WINTER:

1    Q.  -- 2339B.

2           Moving on to page 2 is a section called Factual

3    Basis, the stipulated facts.  You've had an opportunity to

4    look at this paragraph which runs into page 3, it's a series

5    of paragraphs actually, that describes what you did that

6    makes you guilty of this crime, correct?

7    A.  Yes.

8    Q.  And we're going to cover this later in detail, but you

9    understand that that is what is contained in paragraph 2,

10   right?

11   A.  Yep.

12   Q.  Next paragraph, Statutory Penalties, refers to the

13   maximum penalties that attach to the crime that you're

14   pleading guilty to, including 15 years imprisonment, a

15   supervised release term of life, a fine of up to $250,000, a

16   special assessment of $100.  You recognize and acknowledge

17   that those are the maximums that attach to the charge that

18   you're pleading guilty to today, right?

19   A.  Yep.

20   Q.  Paragraph 5, Revocation of Supervised Release, refers to

21   the fact that when you're done with whatever prison time you

22   would get, you would be placed on supervised release and if

23   you violated those terms, you could go back to prison for an

24   additional period of time, correct?

25   A.  Yep.

1    Q.  Paragraph 6 is the guideline sentencing stipulations.

2    There's a reference to the fact that we're going to use the

3    guidelines manual in determining what we think the

4    guidelines are and it starts with a base offense level of

5    26, a reference to specific offense characteristics under

6    paragraph (b) and that we both believe that no specific

7    offense characteristics apply, correct?

8    A.  Um-hmm.

9         MR. SICOLI:  Your Honor, may I have just a moment

10   to talk to my client?

11       (Discussion off the record between

12        the defendant and defense counsel.)

13       MR. SICOLI:  Thank you, Your Honor.

14   BY MR. WINTER:

15   Q.  And under paragraph (c), Adjustments, the parties agree

16   that a 12-level adjustment pursuant to Section 3A1.4(a)

17   applies.  That's the terrorism enhancement.  So it's a

18   12-level increase that's identified in paragraph (c),

19   correct?

20   A.  Yes.

21   Q.  And then we move on to paragraph (d), Acceptance of

22   Responsibility, which is a three-level reduction in your

23   total offense level, but there's a few things you need to do

24   in order to qualify and those are listed there:  Provide

25   full, complete, and truthful disclosures to the Probation

1    Office; comply with any conditions of possible release;

2    testify truthfully today at the change of plea hearing and

3    at any sentencing hearing; and then take no acts that are

4    inconsistent with acceptance of responsibility before the

5    time of sentencing.  And by that it means basically keep

6    your nose clean between now and sentencing, right?

7    A.  Yes.

8    Q.  Okay.  The next paragraph is the total offense level,

9    which we come up with 35.  It's 38 minus three points for

10   the acceptance we just talked about, right?

11   A.  Yes.

12   Q.  Criminal history category comes -- as a result of 3A1.4,

13   you're going to be a Category VI, which then leads us to the

14   guidelines range of 292 to 365 months, but because there's

15   that 15-year maximum, your range is actually 180 months,

16   right?

17   A.  Yes.

18   Q.  Next paragraph discusses the fine range.

19           The paragraph after that refers to the supervised

20   release, which we've already talked about.

21           Paragraph (j) is departures.  You're reserving

22   your right to argue for a downward departure or a variance

23   from that 180 months, right?

24   A.  Yes.

25   Q.  And then (k) is an acknowledgement that the parties

1    don't think there are other specific offense characteristics

2    or adjustments that would apply to move that number up or

3    down, right?

4    A.  Yeah.

5    Q.  Okay.  Paragraph 7, which is at the top of page 6,

6    refers to the discretion of the court.  And this is a

7    function of the fact that the guidelines aren't mandatory.

8    It's really the judge's determination at the end of the day

9    where to place you within those guidelines, right?

10   A.  Yes.

11   Q.  The Court can depart from those guidelines and this lays

12   out the discretion that His Honor is going to have when it

13   comes time for your sentencing, right?

14   A.  Yes.

15   Q.  Special assessment again, $100 in this instance.

16        There's a paragraph regarding forfeiture.  We

17   don't think there's really any forfeiture involved in this

18   case as we stand here today.

19        Paragraph 10 at the bottom of page 6 refers to the

20   immigration consequences.  Again, not positive that any of

21   that actually applies, but you're on notice that it's a

22   possible -- it could have an effect on you as a result of

23   what you plead guilty to today and you're acknowledging that

24   in paragraph 10.

25   A.  Yes.

1    Q.  Do you understand?

2         And then paragraph 11 simply sets forth that the

3    full extent of the Plea Agreement and Sentencing

4    Stipulations are contained in this document and then it's

5    our signatures, right?

6    A.  Yes.

7    Q.  Okay.  And by signing this, are you telling the judge

8    that you understand what's contained in this document?

9    A.  Yeah.

10   Q.  And that you wish to dispose of your case in accord with

11   this document?

12   A.  Yes.

13        MR. WINTER:  Your Honor, I would like to tender

14   the plea agreement at this time.

15        THE COURT:  Keep it there.

16        MR. WINTER:  Okay.

17        THE COURT:  Counsel, is that your understanding of

18   the agreement?

19        MR. SICOLI:  It is, Your Honor.

20        THE COURT:  Swear the defendant in.

21        THE CLERK:  Please raise your right hand.

22   (Defendant sworn.)

23                        **EXAMINATION**

24   BY THE COURT:

25   Q.  Would you state your true and correct name for the

1    record, please.

2    A.  Abdirizak Mohamed Warsame.

3    Q.  And how old are you, sir?

4    A.  I'm good.

5    Q.  I'm sorry.  Everyone -- I'm not moving my tongue fast

6    enough.  How old are you?

7    A.  Oh.  I'm 20 years old.

8    Q.  And how far have you gone in school?

9    A.  Second year in college.

10   Q.  And can you read and write the English language?

11   A.  Yes, I can.

12   Q.  And have you had an opportunity to read the Plea

13   Agreement and Sentencing Stipulations that's before you?

14   A.  Yes.

15   Q.  Have you had an opportunity to go over that Plea

16   Agreement and Sentencing Stipulations with your attorney?

17   A.  Yes.

18   Q.  And have you gone over that Plea Agreement and

19   Sentencing Stipulations line by line with your attorney?

20   A.  Yes.

21   Q.  And did he answer any and all questions that you may

22   have had regarding anything in that Plea Agreement and

23   Sentencing Stipulations?

24   A.  Yes, he did.

25   Q.  And did you understand his answers?

1    A.  Yes.

2    Q.  And so you understand what's in that agreement?

3    A.  Yes.

4    Q.  Now, have you had an opportunity to discuss this matter

5    with your family?

6    A.  Yes, Your Honor.

7    Q.  And so they understand what the plea agreement is?

8    A.  Yes.

9    Q.  And you understand that you're here to enter a plea of

10   guilty to Count 1 of the information?

11   A.  Yes.

12   Q.  Now, I ask you to turn to the last page of that

13   agreement.  And is your signature on that page?

14   A.  Yes, it is.

15   Q.  And did you sign the document --

16   A.  Yes.

17   Q.  -- knowing what was in the document?

18   A.  Yes, I did.

19   Q.  And understanding what's in the document?

20   A.  Yes.

21   Q.  And agreeing with what's in that document?

22   A.  Yes, Your Honor.

23   Q.  You understand that you can continue on and have the

24   grand jury indict you in this matter; do you understand

25   that?

1    A.  Yes.

2              THE COURT:  Counsel, will you go over his rights

3    dealing with having a grand jury.  Do you have a waiver

4    there for that?

5              MR. WINTER:  I do have a waiver, Your Honor.

6              THE COURT:  All right.

7              MR. SICOLI:  I will.

8                              **EXAMINATION**

9    BY MR. SICOLI:

10   Q.  Mr. Warsame, you and I discussed the fact that in a

11   federal felony case you always have a right to have a grand

12   jury, which is a group of citizens, review the evidence

13   presented by the government to determine whether you should

14   be charged with a criminal offense.  You understand that?

15   A.  Yes.

16   Q.  And, in fact, there was -- we actually extended the time

17   that they could get an indictment, but that time period is

18   coming up, but you've agreed to waive that so that we can

19   get this case resolved without it being presented to a grand

20   jury; is that correct?

21   A.  Yes.

22   Q.  And you understand that you have that right, but you

23   want to waive that at this time?

24   A.  Yes.

25              MR. WINTER:  Mr. Warsame, here's a document that

1    puts in writing what your attorney just talked about.  Have

2    you seen this document?  Basically it's your name, accused

3    of conspiring to provide material support to a designated

4    foreign terrorist organization, in violation of Title 18,

5    United States Code, Section 2339B, and you are advised of

6    the nature of the charge and of your rights and hereby waive

7    in open court prosecution by indictment and consent or agree

8    that the proceeding may be by information instead of

9    indictment.  And if that's what you want to do, then go

10   ahead and sign your name there.

11   A.  (Indicating.)

12           MR. WINTER:  For the record, I'm signing it as

13   well as a witness.

14           MR. SICOLI:  For the record, Your Honor, I'm also

15   signing it.

16                          **EXAMINATION**

17   BY THE COURT:

18   Q.  All right.  So you understand that you could continue on

19   and have the grand jury look at this matter to see whether

20   or not they would indict you in this matter?

21   A.  Yes.

22   Q.  And if the grand jury indicted you in this matter, do

23   you understand that you could enter a plea of not guilty and

24   have a jury trial of 12 persons?

25   A.  Yes.

1    Q.  And at your jury trial you would be presumed innocent of

2    any and all charges against you.  Do you understand that?

3    A.  Yes.

4    Q.  And do you also understand that the burden of proof at

5    trial would be upon the government and the government would

6    have to prove you guilty beyond a reasonable doubt?

7    A.  Yes.

8    Q.  Now, proof beyond a reasonable doubt is a very, very

9    high standard.  It's the highest standard we have in our

10   system.  And you understand that that's the burden of the

11   government; do you understand that?

12   A.  Yes.

13   Q.  The way the government would try to prove you guilty

14   beyond a reasonable doubt is by calling witnesses into open

15   court.  Those witnesses would be placed under oath and they

16   would give testimony against you.  Do you understand that?

17   A.  Yes.

18   Q.  You understand that you would have a right to confront

19   and cross-examine those witnesses for the government through

20   your attorney; do you understand that?

21   A.  Yes.

22   Q.  Do you also understand that you have a constitutional

23   right to testify at your trial?

24   A.  Yes.

25   Q.  Now, people get confused about this because their

1    attorneys will tell them you better not testify because if

2    you testify, the jury won't believe you.  But you understand

3    that your attorney, your family, your friends, the

4    government, even the court could not keep you off the

5    witness stand if you wanted to tell your side of the story

6    to the jury.  Do you understand that?

7    A.  Yes.

8    Q.  Now, if you did testify at trial, do you also understand

9    that you would be placed under oath like you are now; do you

10   understand that?

11   A.  Yes.

12   Q.  And that you would be subject to cross examination by

13   the government?

14   A.  Yes.

15   Q.  You understand that you have a right to use the court's

16   power of subpoena to bring in any witnesses or documents

17   necessary for your defense?

18   A.  Yes.

19   Q.  That means if there's documents that you feel that would

20   aid you in your defense, your attorney could subpoena those

21   documents and attempt to have those introduced into evidence

22   if they are relevant.  Do you understand that?

23   A.  Yes.

24   Q.  And also you understand that your attorney could

25   subpoena witnesses to bring them into court to testify on

1    your behalf; do you understand that?

2    A.  Yes.

3    Q.  Do you also understand that you have an absolute right

4    to remain silent?  And that means no one could force you to

5    give evidence against yourself, either today or at your

6    trial.  Do you understand that?

7    A.  Yes.

8    Q.  Now, if we were at your trial and you decided not to

9    testify at your trial, do you understand that's your

10   constitutional right and you could invoke that and that

11   would keep you off the witness stand; do you understand

12   that?

13   A.  Yes.

14   Q.  And do you also understand that neither the government

15   nor the court or anyone else could make any negative

16   comments to the jury about you not testifying; do you

17   understand that?

18   A.  Yes.

19   Q.  That means the government couldn't turn to the jury

20   during their final arguments or during the course of any

21   examination of any of your witnesses to state that, well,

22   Mr. Warsame didn't testify, so he must be guilty or anything

23   like that.  You understand that?

24   A.  Yes.

25   Q.  Do you also understand that you have a right to a speedy

1    trial and you have a right to have your case heard before a

2    judge or a jury for resolution within approximately 71 days

3    of your first appearance; do you understand that?

4    A.  Yes.

5    Q.  That means that the United States cannot keep you locked

6    up for any length of time once you've been charged.  Do you

7    understand that?

8    A.  Yes.

9    Q.  You understand that before a jury of 12 persons could

10   convict you of any count in the indictment, all 12 members

11   of the jury would have to agree beyond a reasonable doubt

12   that you were guilty of that individual count; do you

13   understand that?

14   A.  Yes.

15   Q.  Do you also understand that if I accept your plea of

16   guilty and sentence you, you will not have a trial?  You

17   would not have a court trial -- that's a trial without the

18   jury, it would be before me -- nor would you have a jury

19   trial.  If you elected to have a jury trial, you would have

20   12 individuals from the community sit in judgment of you.

21   You understand if I accept your plea of guilty and sentence

22   you, you will not have a trial, either court nor jury; do

23   you understand that?

24   A.  Yes.

25   Q.  Do you also understand that if I accept your plea of

1    guilty and sentence you, you will have a right to appeal my

2    sentence to the higher court, which is the Eighth Circuit

3    Court of Appeals and they sit in St. Louis, Missouri; do you

4    understand that?

5    A.  Yes.

6    Q.  Now, that higher court reviews all of my sentences to

7    make sure that I follow the law and the Constitution in

8    sentencing individuals.  Do you understand that?

9    A.  Yes.

10   Q.  And you understand that you will have a right to appeal

11   my sentence to them?

12   A.  Yes.

13   Q.  Have there been any threats made to you by anyone to get

14   you to enter a plea of guilty here today?

15   A.  No.

16   Q.  Have there been any promises made to you by anyone,

17   other than what's in the Plea Agreement and Sentencing

18   Stipulations, been made to you to get you to enter a plea of

19   guilty here today?

20   A.  No.

21   Q.  Now, are you under the care of a doctor, nurse, or

22   health practitioner at this time?

23   A.  No.

24   Q.  Are you taking any prescribed medications at this time?

25   A.  No.

1    Q.  Have you had any drugs or alcohol within the last

2    48 hours?

3    A.  No.

4    Q.  Are you clearheaded here today?

5    A.  Yes.

6    Q.  Have you ever seen a psychiatrist, psychologist, or

7    mental health practitioner?

8    A.  No.

9    Q.  Have you had enough time, have you had sufficient time

10   to talk to your attorney about this matter?

11   A.  Yes.

12   Q.  To go over the reams of evidence the government has

13   involved in this case and if you went to trial may present

14   at your trial, have you had an opportunity to go over that

15   with your attorney?

16   A.  Yes.

17   Q.  And are you satisfied with the representation of your

18   attorney?

19   A.  Yes.

20   Q.  Now, you understand that I'm not a party to the Plea

21   Agreement and Sentencing Stipulations that you've entered

22   into?

23   A.  Yes.

24   Q.  I ask you to turn to the last page of the plea agreement

25   again.  Do you see my signature on that page?  My name is

1    Michael Davis.  Do you see my name on that page?

2    A.  No.

3    Q.  Whose names do you see on that page?

4    A.  Andrew Luger, Andrew Winter, John Docherty, myself, and

5    my attorney.

6    Q.  So you understand that the plea agreement is between you

7    and the United States Government; do you understand that?

8    A.  Yes.

9    Q.  You understand my duty and obligation here today is to

10   see -- if you wish to enter a plea of guilty, I have to make

11   sure that you understand your constitutional rights.  Do you

12   understand that?

13   A.  Yes.

14   Q.  And if you do understand your constitutional rights and

15   you still wish to enter a plea of guilty, I have to make

16   sure that you knowingly, voluntarily, and intelligently give

17   up those rights to enter a plea of guilty.  Do you

18   understand that?

19   A.  Yes.

20   Q.  I've gone over the rights with you.  Do you have any

21   questions of me regarding your constitutional rights?

22   A.  No, Your Honor.

23   Q.  Do you need more time to consult with your attorney

24   about your constitutional rights and whether or not you wish

25   to continue?

1    A.  No.

2    Q.  Do you still wish to enter a plea of guilty to Count 1

3    of the information?

4    A.  Yes, Your Honor.

5    Q.  And do you knowingly, voluntarily, and intelligently

6    give up your constitutional rights to enter that plea to

7    Count 1 of the information?

8    A.  Yes, Your Honor.

9    Q.  To Count 1 of the information, which charges you with

10   conspiracy to provide material support and resources to

11   ISIL, the Islamic State of Iraq and Levant, a designated

12   foreign terrorist organization, in violation of Title 18,

13   United States Code, Section 2339B, how do you plead to that

14   count of the indictment?

15   A.  Guilty.

16   Q.  Now, just because you've entered a plea of guilty does

17   not mean, in fact, that you are guilty of the offense.  I

18   will have to hear from your own mouth, just not "yes" or

19   "no," I will have to hear from you what you did to make you

20   guilty of this offense.  I cannot accept a plea of guilty

21   from someone that is not guilty or innocent of the charges.

22   Do you understand that?

23   A.  Yes.

24   Q.  Are you ready to proceed?

25   A.  Yes.

1          THE COURT:  Mr. Winter, you may inquire.

2          MR. WINTER:  Thank you.

3                              **EXAMINATION**

4    BY MR. WINTER:

5    Q.  As the Court has indicated, Mr. Warsame, he wants to

6    hear from you what it is that you did that makes you guilty

7    of the crime of conspiring to provide material support to

8    ISIL.  To aid in that, I'm going to turn to the second page

9    of the plea agreement.  It's the factual basis and

10   stipulated facts.

11          Would you tell the judge what was happening in the

12   early months of 2014 between you and your co-conspirators

13   and what you were talking about at that time.

14   A.  At the time, Your Honor, we were having meetings and

15   conversations about possible ways to join the Islamic State.

16   Q.  And when you were talking about joining the Islamic

17   State at that time, did you know that the -- when you refer

18   to Islamic State, that's another term for ISIL, the

19   designated foreign terrorist organization, correct?

20   A.  Yes.

21   Q.  At the time you were having these conversations, there

22   was a lot of media, a lot of press about ISIL and what they

23   were doing, correct?

24   A.  Yes.

25   Q.  And is it fair to say that you and your co-conspirators

1    understood that they were a designated foreign terrorist

2    organization, an organization the U.S. government didn't

3    want you to join?

4    A.  Yes.

5         THE COURT:  Well, I want to make sure "you"

6    understood that.

7         THE WITNESS:  Yes, I do understand.

8    BY MR. WINTER:

9    Q.  What were some of the specific things that you and your

10   co-conspirators talked about in the early months of 2014

11   relative to going overseas to join ISIL?

12   A.  We talked about ways of getting documents so that we can

13   travel there.  We also had conversations about possible ways

14   to be financially stable in doing that.

15   Q.  Figure out ways to pay for airfare and documents, things

16   of that nature?

17   A.  Yes.

18        THE COURT:  Now, this started in early spring or

19   March of 2014?

20        THE DEFENDANT:  Yes, Your Honor.

21        THE COURT:  How did it come up?  It just didn't

22   fall out of the sky.  What happened?  What brought this

23   about?

24        THE DEFENDANT:  One of the reasons was we were

25   always watching propaganda videos on YouTube.  One of my

1    good friends at the time who was named Abdi Nur came up with

2    an idea and he wanted to go to ISIS and so we talked about

3    possible ways of going and we -- we'd been watching

4    propaganda videos for some time and we decided it was a time

5    to not only talk, but to put it into some action and do

6    that.

7           THE COURT:  Now, let's back up.  Were you just

8    watching ISIL videos or were you also watching al-Shabaab

9    videos?

10          THE DEFENDANT:  Before ISIL came up a lot on the

11   news, we were watching al-Shabaab videos and then at the

12   time we stopped watching al-Shabaab videos and we moved on

13   to ISIL videos.

14          THE COURT:  Can you give me a brief description of

15   what those videos showed.

16          THE DEFENDANT:  Well, some of those videos showed

17   mujahideen, which means people who emigrate, and it showed

18   people from all parts of the world who are joining ISIS and

19   it talked about how their main plan was to make a caliphate

20   and to stop oppression from the disbelievers.

21          THE COURT:  Now, how old were you when you started

22   watching these videos?

23          THE DEFENDANT:  What do you mean?

24          THE COURT:  How old were you --

25          THE DEFENDANT:  Oh.  At the time I was -- I had

1        just turned 18.

2                    THE COURT:  That's the first time that you had

3        seen the videos?

4                    THE DEFENDANT:  Yeah.  Roughly around 17, 18.

5                    THE COURT:  Are you Shia or Sunni?

6                    THE DEFENDANT:  Sunni.

7                    THE COURT:  And is your household very religious?

8                    THE DEFENDANT:  Yeah.

9                    THE COURT:  Are you very religious?

10                   THE DEFENDANT:  Yes.

11                   THE COURT:  What attracted you to these videos?

12                   THE DEFENDANT:  Listening -- I used to listen to

13       Anwar al-Awlaki a lot and I used to listen to a lot of his

14       lectures.  And I didn't really know much about Islam and so

15       when I started learning about, you know, Islam and started

16       learning about the history of Islam, I wouldn't necessarily

17       listen -- or read books about it, but I would go listen to

18       lectures by Anwar al-Awlaki and I started to -- that's how I

19       started to learn more about the religion.

20                   THE COURT:  Now, let's quickly go back to the

21       videos.  Did any of those videos show killings?

22                   THE DEFENDANT:  Yes.

23                   THE COURT:  And what can you tell me about that?

24                   THE DEFENDANT:  Some of the videos showed the

25       Iraqi Army and the Syrian Army being killed by ISIS in a

1    battle and most of the videos, it was basically Sunnis

2    fighting against Shiites and the Army.

3            THE COURT:  You may continue.

4    BY MR. WINTER:

5    Q.  Mr. Warsame, did there come a point in time that you, to

6    fulfill your desire to travel, needed to get a passport?

7    A.  Yes.

8    Q.  What did you do in order to get a passport?

9    A.  I went to a passport agency here downtown with Abdi Nur

10   and we grabbed applications.  And after that I filled out

11   the application and I paid the fee, the application fee.

12   Q.  You requested an expedited passport, correct?

13   A.  Yes.

14   Q.  And why an expedited passport?

15   A.  To travel as soon as possible.

16   Q.  Because this is April and this is around the time that

17   your good friend Abdi Nur and some other individuals were

18   planning on leaving for Syria, correct?

19   A.  Yes.

20   Q.  And as part of your passport application, you were not

21   truthful about your purpose of travel in the document; is

22   that correct?

23   A.  Yes.

24   Q.  It's correct that you actually made a false statement as

25   part of that passport application?

1    A.  Yes, I did.

2    Q.  Also in April --

3              THE COURT:  And what was the false statement?

4              THE DEFENDANT:  Where it asks where are you

5    traveling to, I wrote Australia and I told the agent, the

6    passport agent, that I was going to be traveling with my

7    family.

8    BY MR. WINTER:

9    Q.  And that was false because what were you planning?

10   A.  That was false because I was actually planning on

11   traveling to Turkey to get to Syria.

12   Q.  Did you also help a co-conspirator with his ability to

13   obtain a passport?

14   A.  Yes.

15   Q.  Explain that, please.

16   A.  During also that time I paid -- I gave $200 to Adnan

17   Farah so he can get his passport, an expedited passport.

18   Q.  When you gave him that $200 for the expedited passport,

19   did you know why he wanted an expedited passport?

20   A.  Yes.

21   Q.  And why did he want an expedited passport?

22   A.  He wanted the expedited passport because he also wanted

23   to travel to Syria.

24             THE COURT:  Now, when you went in for the

25   expedited passport, you were turned down in April, is that

1   right, or March?

2          THE DEFENDANT:  Not necessarily.  The agent told

3   me that they didn't have enough information, but they gave

4   me I think it was a 90-day limit to bring in more documents,

5   but they never told me it was denied.

6          THE COURT:  At least you didn't get a passport at

7   that time?

8          THE DEFENDANT:  Yes.

9          THE COURT:  And then you did come back later in

10  August to get the passport?

11          THE DEFENDANT:  No.  At the time when I received

12  it I was living in Chicago with my father.

13  BY MR. WINTER:

14  Q.  But you went back in to apply for it in August or not?

15  A.  No, I did not apply for it.

16  Q.  Did you submit the documents necessary --

17  A.  No.  After the first time I went to the passport agency,

18  I went there also multiple times after and gave them the

19  documents and then after that I moved to Chicago.

20          THE COURT:  Continue.

21  BY MR. WINTER:

22  Q.  Turning to May of 2014, you and your co-conspirators

23  would have, at least on a temporary basis, a leader of your

24  group called an emir; is that correct?

25  A.  Yes.

1    Q.  When this all started in the spring, was the emir at one

2    point in time a person known to you as Guled Ali Omar?

3    A.  Yes.

4    Q.  As a result of his plans to leave --

5              THE COURT:  Let's back up.  I don't need words put

6    in his mouth.  Why don't you tell us how the meetings

7    occurred and how the emir was selected.

8              THE DEFENDANT:  Well, we had a couple of meetings,

9    but we also had other meetings where we would talk about the

10   religion and try to learn as much as we can about the

11   religion and it was -- there was a bunch of other youth

12   there and so as a group we all elected or chose Guled Omar

13   to be the emir at that time.

14             THE COURT:  And why was that?

15             THE DEFENDANT:  I don't know.  Everybody just

16   chose, decided.  I mean, I specifically chose Guled Omar

17   because he was capable of being a good leader.

18             THE COURT:  Now, were you affiliated with a

19   mosque?

20             THE DEFENDANT:  A mosque, yes.

21             THE COURT:  Had you learned anything about the

22   Quran at that mosque?

23             THE DEFENDANT:  Yes, I did.

24             THE COURT:  Was that different than what you

25   learned from the lectures that you --

1          THE DEFENDANT:  No, it was pretty much the same.

2     It was -- we talked more about the prophets and his

3     companions and we talked about the prophets of Allah, but

4     there were other people there who were not in the

5     conspiracy, so we didn't feel like talking about our plans

6     at those meetings.

7          THE COURT:  Now, it's one thing to be watching

8     videos, watching the news, reading the newspaper, and

9     talking to your friends about what's happening around the

10    world.  What made you decide that you had to go to Iraq?

11         THE DEFENDANT:  Your Honor, at the time I felt

12    like it was a duty to go and help the innocent people in

13    Iraq and Syria at the time because of the oppression that

14    was going on there and so I felt it was something that I had

15    to do.

16         THE COURT:  Did you know what you were going to be

17    doing when you went there?

18         THE DEFENDANT:  Yes.

19         THE COURT:  And what was that?

20         THE DEFENDANT:  Engaging in combat.

21         THE COURT:  And what does that mean?

22         THE DEFENDANT:  That means fighting, training, and

23    being a citizen of the so-called Islamic State.

24         THE COURT:  Well, what else does combat mean?

25         THE DEFENDANT:  Beheadings and just fighting with

1    weapons against anyone that was opposed to the Islamic

2    State.

3              THE COURT:  What was attractive to you about the

4    Islamic State or the caliphate?

5              THE DEFENDANT:  At the time what I was attracted

6    to was being able to go to war and fight and bring back the

7    caliphate.

8              THE COURT:  And what does "caliphate" mean to you?

9              THE DEFENDANT:  "Caliphate" in Islam means --

10             THE COURT:  To you.

11             THE DEFENDANT:  To me?

12             THE COURT:  Yes.

13             THE DEFENDANT:  It meant, you know, Islam would

14   take over the world and, you know, Muslims would no longer

15   be oppressed all around the world.

16             THE COURT:  Now, can you tell me -- you were

17   worried about the oppression of people; is that correct?

18             THE DEFENDANT:  Yes.

19             THE COURT:  You could have joined the United

20   States military?

21             THE DEFENDANT:  Right.

22             THE COURT:  Why didn't you do that?

23             THE DEFENDANT:  Because I didn't think the United

24   States military went by Islam.

25             THE COURT:  Continue.

1    BY MR. WINTER:

2    Q.  Did you at some point take over a leadership role, even

3    just temporarily?

4    A.  Yes.

5    Q.  Would you explain that to His Honor, please.

6    A.  At the time when some of the other conspirators, such as

7    Guled, Abdirahman Bashir, Yusuf Jama, planned to go to

8    Mexico, they chose me as an emir for the people that would

9    be left behind.

10   Q.  And in that role, what did you do?

11   A.  I told everybody who was in the conspiracy to try to get

12   their passports as soon as possible and try to leave before

13   the summer ends.

14   Q.  Were you aware of Abdullahi Yusuf and Abdi Nur's plans

15   to leave in late May?

16   A.  Yes.

17   Q.  How were you aware of their plans?

18   A.  One day we went shopping and they were shopping for

19   clothes and backpacks, other materials that they needed to

20   go over there with and I joined them and went shopping with

21   them.

22   Q.  And at that point it was obvious to you that they were

23   getting ready to leave imminently; is that fair to say?

24   A.  Yes.

25   Q.  And they, in fact, left the next day and the day after;

1      is that right?

2      A.  Right.

3      Q.  In June of 2014 were you contacted by an individual

4      known to you by the initials H.K. who was over in Turkey?

5      A.  Can you say that again?

6      Q.  In June were you contacted by someone who was in Turkey

7      who was trying to join ISIL?

8      A.  Yes.

9      Q.  And the person's initials are H.K., right?

10     A.  No.  That was Y.J.

11     Q.  Oh, Y.J.  I'm sorry.  Y.J.  What was that contact about?

12     Why did Y.J. -- you've already mentioned his name, Yusuf

13     Jama.  Why did he call you?

14     A.  He called me because he said that he was in Turkey and

15     that he needed a number so he can go over and cross the

16     border to Syria.  And at the time I called Abdirahman

17     Bashir, who was at the time in California, and he knew -- he

18     had the number.  So I called him and asked him for the

19     number so that I can give it to Yusuf Jama.

20     Q.  And you were able to get the number and pass it on to

21     Yusuf Jama; is that right?

22     A.  Yes.

23     Q.  And what happened to Yusuf Jama after that?

24     A.  He went to -- he called the number and he went to Syria.

25     Q.  And joined ISIL?

1     A.   Right.

2     Q.   When you passed the number on to Yusuf Jama, you knew

3     that you were essentially helping him get to the ranks of

4     ISIL; is that fair to say?

5     A.   Yes.

6     Q.   Did you stay in contact with the co-conspirators you've

7     talked about and others throughout the summer of 2014 and

8     on?

9     A.   Yes, I did.

10    Q.   But you had mentioned already to the judge that you

11    moved to Chicago at some point during the summer; is that

12    right?

13    A.   Correct.

14    Q.   Then in April of 2015 did you come back to the Twin

15    Cities for a visit?

16    A.   Yes, I did.

17    Q.   Would you describe for the judge what you did while you

18    were back for this visit that is part of what you're

19    admitting to the Court today, the conduct that you're

20    admitting.

21    A.   So in April 2015 when I was living in Chicago I came

22    here for a spring break and at the time I met up with Guled

23    Omar and Abdirahman Bashir and I kept encouraging Guled to

24    continue his efforts in trying to go to Syria.

25    Q.   To join what organization?

1    A.  To join ISIL.

2    Q.  And you did it more than once; fair to say?

3    A.  Yes.

4    Q.  You repeatedly encouraged him?

5    A.  Yes.

6              MR. WINTER:  Your Honor, the government has

7    nothing further in terms of a factual basis.

8                          **EXAMINATION**

9    BY THE COURT:

10   Q.  Well, let's back up.  You were -- you stated that you

11   were going to fight for ISIL and for the caliphate; is that

12   right?

13   A.  Yes.

14   Q.  And you said something about combat?

15   A.  Yes.

16   Q.  Did that include killing?

17   A.  Yes, it did.

18   Q.  Did it include murder?

19   A.  Yes, it did.

20   Q.  And so you understood that before there were any plans

21   for you to leave?

22   A.  Yes.

23   Q.  Would it be accurate that the people that were involved

24   in your conspiracy thought the same thing?

25   A.  Yes, Your Honor.

1    Q.   Now, did you tell people about this or did you keep it a

2    secret?  Other than the people that were involved in the

3    conspiracy, did you go around telling your friends that

4    weren't involved?

5    A.   No.

6    Q.   Why was that?

7    A.   Because I knew it would get me in trouble.

8    Q.   Do you have any brothers and sisters?

9    A.   Yes.

10   Q.   Did you tell your mother?

11   A.   No.

12   Q.   Did you tell your father?

13   A.   No.

14   Q.   What's the age range of your brothers and sisters?

15   A.   The oldest is 22 and the youngest is four.

16   Q.   And the oldest one, is that a boy or a girl?

17   A.   A girl.

18   Q.   Did she know about what you were doing?

19   A.   No.

20   Q.   Let me back up.  Are there any of your relatives that

21   have been involved in al-Shabaab or ISIL or any other

22   terrorist organization, whether or not designated as a

23   terrorist organization by the Department of State?

24   A.   No.

25   Q.   Are any of the other co-defendants that have been

1    charged relatives of yours?

2    A.  Relatives?

3    Q.  Relatives.

4    A.  Yes.

5    Q.  Which ones?

6    A.  Me and Abdirahman Daud come from the same clan or the

7    same tribe.

8    Q.  And what clan is that?

9    A.  Majeerteen.

10   Q.  Now, one of the issues in this case is that the

11   government has a confidential human source, a person that is

12   cooperating with the government.  Do you understand that?

13   A.  Yes.

14   Q.  And you know who that is?

15   A.  Yes.

16   Q.  The issue here that I have to have your attorney go over

17   is dealing with the issues of entrapment.  You understand

18   the government has the burden of proving beyond a reasonable

19   doubt that you were not entrapped by showing either that you

20   were willing to commit the named charge that you've pled

21   guilty to before you were approached or contacted by law

22   enforcement agents or someone acting for the government or,

23   two, the government or someone acting for the government did

24   not persuade or talk to you in committing this charge?  Have

25   you talked to your attorney about that, about entrapment?

1    A.  Yes.

2              THE COURT:  Counsel, will you go over in detail

3    and make sure that we have a clean record dealing with that.

4              MR. SICOLI:  Sure.

5                        **EXAMINATION**

6    BY MR. SICOLI:

7    Q.  Mr. Warsame, you and I talked about the fact that in

8    certain cases you can claim that the government -- because

9    of the government actions, in other words, somebody who is

10   working for the government, in this case the confidential

11   human source, that they basically encouraged you to commit

12   the crime and you wouldn't have committed the crime other

13   than the fact of the encouragement of that government agent

14   who is working for the government.  Do you understand that?

15   A.  Yes.

16   Q.  Now, in this case there was a confidential human source

17   that tape-recorded some conversations you had with him and

18   some other co-conspirators; is that correct?

19   A.  Yes.

20   Q.  And those tape-recorded conversations actually occurred

21   significantly after you started your involvement in this

22   conspiracy; is that correct?

23   A.  Yes.

24   Q.  And it wasn't because of anything that the confidential

25   human source did that made you commit this crime; is that

1    correct?

2    A.  Yes.

3    Q.  You were predisposed to commit the crime?

4    A.  Yes.

5    Q.  And you had no doubt --

6            THE COURT:  Do you know what "predisposed" means?

7            THE DEFENDANT:  Yes.

8            THE COURT:  We're using legal language.  I want

9    him to understand and I want to make sure that I understand

10   he understands.

11           MR. SICOLI:  Sure.

12           THE WITNESS:  Yes, I do understand.

13   BY MR. SICOLI:

14   Q.  What does "predisposition" mean to you or "predisposed"?

15   A.  That I knew about it before and that I wanted to do that

16   before he came to me.

17           MR. SICOLI:  Is that sufficient, Your Honor, or

18   would you like any other inquiry?

19           THE COURT:  Mr. Winter, is that enough for the

20   government?

21           MR. WINTER:  Yes, Your Honor, it is.

22                            **EXAMINATION**

23   BY THE COURT:

24   Q.  Well, I want to make sure.  You understand that the law

25   allows the government to use undercover agents, deception,

1    and other methods in weeding out crime; do you understand

2    that?

3    A.   Yes.

4    Q.   And you're not saying the government in any way or the

5    government's agent, the confidential informant, made you do

6    something that you did not want to do?

7    A.   Yes.

8    Q.   Have you ever picked up a gun?

9    A.   No.

10   Q.   Have you ever shot a rifle or gun --

11   A.   No.

12   Q.   -- or pistol?

13   A.   No.

14   Q.   Have you ever killed an animal?

15   A.   No.

16   Q.   Can you tell me, if you can, how and why you would go to

17   Syria to kill people?

18   A.   I thought it was -- at the time I thought it was the

19   right thing to do and it was justified.

20   Q.   Justified by what?

21   A.   I thought it was justified by Islam.

22   Q.   And what in Islam would justify that?

23   A.   That when the Muslims are being oppressed and attacked,

24   that you have to go aid them and help them no matter what.

25   Q.   Well, did you know that you would be attacking other

1    Muslims?

2    A.   No.

3    Q.   Hmm?

4    A.   No.

5    Q.   Do you consider Shia Muslims?

6    A.   No, I do not consider them as Muslims.

7    Q.   In what classification do you put the Shia?

8    A.   They do not believe in the Prophet Muhammad, that he was

9    the last prophet.

10   Q.   Let me ask you again:  Is there any other relatives that

11   are either co-defendants in other cases or otherwise of

12   yours that are involved in al-Shabaab or ISIL?

13   A.   No.

14            THE COURT:  Any further questions?

15            MR. SICOLI:  Your Honor, if I could inquire just

16   briefly?

17            THE COURT:  Sure.

18                          **EXAMINATION**

19   BY MR. SICOLI:

20   Q.   Mr. Warsame, you and I have met -- I've represented you

21   since you were first charged in this case; is that correct?

22   A.   Yes.

23   Q.   And you and I have met ten times in the Anoka County

24   Jail; is that correct?

25   A.   Yes.

1    Q.  And we've talked about, as the judge asked you about,

2    sort of what your feelings were and what your beliefs were

3    at the time about why it was okay to go to Syria.  Did that

4    start to change for you?

5    A.  Yes, it did.

6    Q.  Can you explain that to the judge and how your

7    viewpoints started to change.

8    A.  It began to change once I saw that everything that they

9    were doing, most of the things that they were doing was

10   leading to too much killing and killing of innocent people

11   that had nothing to do with them.

12          And also I watched a video where they burned a

13   pilot alive and that's a contradiction to the beliefs, that

14   Islamic can't burn someone, you know, whether they're dead

15   or alive.

16          And I was always looking at one side of the story.

17   I wasn't looking at the other side.  I was just listening to

18   lectures about, you know, jihad and all that.  It always

19   told me to not -- to just look at one side no matter what

20   and so I didn't see the other side to it, you know, that

21   there were innocent people being killed.

22                          **EXAMINATION**

23   BY THE COURT:

24   Q.  Now, the mosque that you went to, you said -- can you

25   tell me, were they teaching the same type of things that

1    your lectures were, that Shia were non-Muslims?

2    A.   No.

3    Q.   So how long had you been going to the mosque?

4    A.   At that specific mosque, probably the summer of 2013.

5    Q.   You had been to other mosques?

6    A.   Correct.

7    Q.   Did any of the mosques that you've been to preach to you

8    that Shia were not Muslims?

9    A.   No.

10   Q.   Why would the lectures carry more weight than the imams

11   in the mosque?

12   A.   Well, at the time I felt like the imams and the leaders

13   at the mosques were, you know, not on the side of ISIL and

14   so at the time I believed that, you know, they were wrong

15   and, you know, that their ideology wasn't the correct

16   ideology and that the ideology of, you know, Anwar al-Awlaki

17   and others who were, you know, in Syria and Iraq, that that

18   was the right ideology.

19   Q.   You mentioned that you had looked at al-Shabaab videos;

20   is that correct?

21   A.   Yes.

22   Q.   Did al-Shabaab have any interest -- did you have any

23   interest in al-Shabaab?

24   A.   No.

25   Q.   Why is that?

1    A.  Because growing up in a Somali household, you know, I

2    always heard about -- I always heard my parents talking

3    about them and all the things that they would do and, you

4    know, I looked at that as, you know, it was not an option,

5    you know, and that they were always wrong.

6           But then I also, you know, would listen to Anwar

7    al-Awlaki and he would always talk good about al-Shabaab and

8    so I would think of them as good, but I never had any

9    intention of trying to join them simply because they were

10   against the Islamic State.

11   Q.  Have you listened to any of Osama bin Laden's tapes?

12   A.  No.

13   Q.  Or any al-Qaeda tapes?

14   A.  Yeah.

15   Q.  What did you think of al-Qaeda?

16   A.  I mean, that was the side where Anwar al-Awlaki, you

17   know, kind of was with and, you know, he was a part of them.

18   And so at the time before ISIL, you know, was known as a

19   terrorist organization, I was more lenient with al-Qaeda.

20   Then after ISIL came, they had some type of dispute and, you

21   know, they were at war with each other and so I chose the

22   side of ISIL.

23   Q.  Do you know the name of the emir of ISIL?

24   A.  Yeah.

25   Q.  What's his name?

1    A.   Abu Bakr al-Baghdadi.

2    Q.   What do you know about him?

3    A.   He was chosen to be the caliphate of the Muslims and

4    that he was imprisoned in Iraq before he joined ISIL.

5    Q.   So you've studied ISIL?

6    A.   Yes.

7    Q.   You've studied al-Shabaab?

8    A.   Not really.

9    Q.   Have you studied al-Qaeda?

10   A.   Yes, kind of.

11   Q.   Is Mohamed Abdullah Warsame any relation of yours?

12   A.   Can you say that name again?

13   Q.   Mohamed, M-o-h-a-m-e-d, Abdullah, A-b-d-u-l-l-a-h,

14   Warsame any relation of yours?

15   A.   I don't think so.

16             THE COURT:  The Court will accept the plea of

17   guilty and I will order a presentence investigation report

18   to be completed in this matter in a timely fashion.

19             Sir, within seven days of today's date or a date

20   that's convenient for your attorney and you, you will meet

21   with a probation officer and have an interview.

22             The Probation Office will continue to work on a

23   presentence investigation report on you.  Once that report

24   is completed, a copy of that report will be sent to your

25   attorney and also to the government.

1              You will have an absolute right to read that

2       report.  You will have an absolute right to make any

3       objections, additions, or corrections to that report and you

4       make sure that you report all that to your attorney so he

5       can submit that information to the probation officer.  The

6       government will have the same opportunity.  And once the

7       final report is completed, it will be sent to me and I will

8       set down a date for your sentencing.

9              At your sentencing you will have -- if there's any

10      motions to be made on your behalf, I will rule on those

11      motions in open court in front of you and your attorney and

12      the government and then we'll move into the sentencing phase

13      of the hearing.

14             Counsel will have an opportunity to argue for a

15      certain sentence for you.  You will have an absolute right

16      to talk to me.  You will have an absolute right to tell me

17      anything that you want to tell me about yourself, about this

18      offense, or anything else you think I should know before I

19      sentence you.

20             The government will have an opportunity to respond

21      to anything that you have said or anything that your

22      attorney has said and the government will have an

23      opportunity to argue for a certain sentence for you and then

24      I will sentence you.

25             Do you understand the procedures that we'll be

1    using from now on?

2            THE DEFENDANT:  Yes, Your Honor.

3            THE COURT:  And do you understand what you've done

4    here today, sir?

5            THE DEFENDANT:  Yes.

6            THE COURT:  And can you tell me what you've done

7    here today?

8            THE DEFENDANT:  I provided support and agreed with

9    others to go overseas and join a terrorist organization.

10           THE COURT:  And do you know the maximum sentence

11   that you could receive?

12           THE DEFENDANT:  Yes.

13           THE COURT:  Can you tell me?

14           THE DEFENDANT:  Fifteen years.

15           THE COURT:  You may submit the Plea Agreement and

16   Sentencing Stipulations for the record and also the waiver

17   of the grand jury for indictment.

18           Counsel, anything further?

19           MR. SICOLI:  No, Your Honor.

20           MR. WINTER:  Nothing from the government.  Thank

21   you.

22           THE COURT:  Do you have any questions of me, sir?

23           THE DEFENDANT:  No.

24           THE COURT:  Do you understand what's going on?

25           THE DEFENDANT:  Yes, I do.

1          THE COURT:  The defendant is remanded to the

2     custody of the United States Marshal.  We will stand in

3     recess and I will see counsel in chambers.

4          (Court adjourned at 2:11 p.m.)

5                         *      *      *

6

7

8

9          I, Lori A. Simpson, certify that the foregoing is a

10    correct transcript from the record of proceedings in the

11    above-entitled matter.

12

13                   Certified by:  *s/ Lori A. Simpson*

14                                  Lori A. Simpson, RMR-CRR

15

16

17

18

19

20

21

22

23

24

25