UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CRIM. NO. 16-CR-37 (MJD)

_____

UNITED STATES OF AMERICA,

    Plaintiff,      **DEFENDANT'S POSITION AS TO
                 SENTENCING AND SENTENCING
                 MEMORANDUM.**

v.

ABDIRIZAK MOHAMED WARSAME,

    Defendant.

_____

## I. <u>INTRODUCTION</u>

This defendant, Abdirizak Warsame, comes before the Court at a time of great changes in federal sentencing practice.  In this post-*Booker* world, and perhaps as a nod to the inherent limitations of a mandatory predetermined sentencing scheme, this Court's assessment of the appropriate sentence is no longer solely, or even mostly, controlled by the United States Sentencing Guidelines.  Its graphs and tables are now a consideration, but not the end of the sentencing analysis.  Its "adjusted offense level" now yields to a district court's discretion and experience.  In this case, in particular, that discretion is informed by this Court's institutional experience with cases involving terrorism as well as other cases within the District involving similarly situated defendants.  This institutional experience removes the weight that would have been assigned by the rigidly scripted process of arriving at a federal sentence in the past, and in the words of the Court in *Rita*,

replaced it with the "retail" sentencing that is now possible amidst the nearly boundless sentencing discretion possessed by this court.

Amidst this changed sentencing landscape, appears before this Court Abdirizak Warsame, who through counsel, provides the following Position as to Sentencing and Sentencing Memorandum.  For the reasons set forth below, the defendant respectfully submits that a sentence of 18 months in custody is a sentence that is sufficient, but no greater than necessary to carry out the statutory purposes of sentencing.

## II.   BACKGROUND

### A.  *How did Mr. Warsame choose this path?*

There is no easy explanation for how Mr. Warsame got involved or interested in ISIL.  He came to the United States as an infant, but found himself as a teenager "stuck between two worlds."  He was living in a conservative family and community of Somalis, but attending Minnesota public schools.  He felt he was too "foreign" for his Minnesotan classmates with whom he desperately wanted to join, but American culture was too unfamiliar to his family who expressed their disapproval of the music and values expressed by pop culture.  There was a deep and pervasive feeling of not fitting in anywhere.  Not at home.  Not at school. Not with the typical kid from down the block. This distinct feeling of separateness made him easy pickings for the propaganda of ISIL whose message reflected a seductive "push and pull." As described by United States Attorney Andrew Luger, the "pull" of ISIL is in its message that "*we are building a perfect world*, *join us."*  The "push" strikes right at the heart of the marginalized feeling

2

of teens generally, and Somali teens specifically:  "*They will never accept you,*" ISIL says of Americans, "*there is no place for you here.*"

The "*Hearts and Minds*" lecture of Anwar al-Awlaki made Mr. Warsame believe he did have a place.  That lecture spoke right to him; al-Awlaki *seemed* like he was speaking right to him.  "*You are a chosen one,*" al-Awlaki told him over and over as he watched and listened to the youtube videos of his speeches repeatedly.  As a teenager with little experience in reasoning, he was hooked by the videos, the music, [1]and the promise of doing something he thought was for the greatest of goods:  for the salvation of his family.  He found others who were thinking the same thoughts and having the same feelings.  Together these young men began walking an extraordinarily perilous path.

### B.  *Mr. Warsame's involvement in the offense*

In approximately February or March of 2014, a group of individuals which included Mohamed Farah, Abdirahman Daud, Guled Omar, Abdi Nur, Adnan Farah, Abdulahi Yusef and a little later Yusef Jama, began discussing the atrocities perpetuated by the Syrian leader Assad against the Syrian people and the groups that were fighting him.  The group started talking about going over to Syria, but at this time no one was really serious about it.  *Transcript of Trial Testimony of Abdirizak Warsame* (hereinafter "T"), May 24, Volume I, page 7-8.

---

[1] Harnessing the "free-wheeling, decentralized nature"of YouTube, Twitter, Instagram, Facebook, among other social media platforms, one writer has termed ISIL's "war of ideas" as "high-tech media jihad." Brookings Report at 12.: James P. Farwell, *Jihadi Video in the "War of Ideas"* Survival, Vol. 52. No. 6, December 2010-January 2011, pp. 127-150; Alex Marshall, *How Isis Got its Anthem*, The Guardian (US edition), November 9, 2014, available at  https://www.theguardian.com/music/2014/nov/09/nasheed-how-isis-got-its-anthem

PDF created with pdfFactory trial version www.pdffactory.com

In mid-March, Mr. Warsame was at the mosque and co-conspirator Abdirahman Bashir pulled him aside and told him that someone was going to be leaving for Syria to go fight with ISIL, but he did not tell him the identity of that person.  The next day or shortly thereafter, Mr. Warsame learned that Hanad Mohallim, who was younger than Mr. Warsame, and who attended Heritage Academy with Mr. Warsame, had left the day after Bashir talked to Mr. Warsame to travel to Syria and joined ISIL.  *T. 13-14.*  After he was successful that inspired the rest of the group to try and leave, because he was younger than the rest of the people in the group and had made it to Syria.  *T. 14.*

After Mohallim left to go to Syria, the group started listening to more lectures from cleric Anwar al-Awaki.   In April 2014, the group started to discuss travel documents to travel to Syria.  Guled Omar, Abdi Nur, Daud, Abdulahi Yusef and the Farah brothers were able to get their travel documents before the failed travel in May of 2014. *T. 19.*  Mr. Warsame had discussions with Nur about getting a passport to travel. Nur and Mr. Warsame went to the passport office together to obtain the passport application and instructions, but did not file for a passport at that time.  Mr. Warsame completed the paperwork and lied on the application by stating that he wanted to travel to the United Kingdom.  When he was at the passport office, he told the agent that he was going to Australia, even though his application said UK.  Mr. Warsame was with Nur when Nur received his passport.  Mr. Warsame was not given his passport because they kept on telling him that he needed more documents showing citizenship.

PDF created with pdfFactory trial version www.pdffactory.com

Mr. Warsame gave Adnan Farah the $200 he needed to get an expedited passport. Mr. Warsame sold an old cell phone he had to obtain the money to give to Adnan Farah. Adnan Farah's passport was sent to his house, and his parents saw it and took it. They also found Mohamed Farah's passport and took and kept it at Mohamed Farah's grandmother's house. *T. 19-23.*

Yusef Jama joined the conspiracy mid to late April of 2014. Jama's brother, Ahmed Bashi, was fighting in Somalia with Al-Shabaab, and at first wanted to join his brother in Somalia. Guled Omar and Mr. Warsame convinced him that it would be better to fight for ISIL in Syria. This conversation with Jama was in April so it was before Mr. Warsame was voted in as the emir of the group. *T. 25-26.* At the end of May, Mr. Warsame was selected as the emir of the group because the current emir, Guled Omar, and other co-conspirators were going to leave for Syria. Guled Omar felt he could not travel by plane because he had been stopped before when he tried to travel by plane. So they developed two plans to travel to Syria. Omar, Bashir, and Jama were going to travel by car to Mexico and then fly out of Mexico to Turkey. Nur and Yusef were going to fly to Turkey from Minneapolis. Before the trip, which was scheduled for late May (May 28), Warsame and others from the group went shopping at Macy's with Nur so he could buy items for the trip. *T. 26-36.* On May 28, Mr. Warsami was at the Dugsi (weekend Islamic school), and received a call from Nur stating that there was an emergency and could he come to Powderhorn Park in South Minneapolis. When he got there, Yusuf Jama, Abdi Nur, Guled Omar and Abdirahman Daud were there. He learned that Omar's

PDF created with pdfFactory trial version www.pdffactory.com

family stopped them from leaving Omar's house, so they were unable to drive to Mexico. *T. 37.*  Nur said that he was still going to try and leave without the others.  He also learned later that Yusuf tried to catch a flight out of Minneapolis shortly after the May meeting at Powderhorn Park, but was stopped when he boarded the flight.  However, Nur left the next day May 29 and successfully traveled to Syria.  Mr. Warsame learned this when he was playing basketball at the mosque and Nur's family came to the mosque asking where Nur was. They were very distraught. *T. 37-40.*

Yusuf Jama successfully left for Syria by plane on June 8, 2014.  Prior to Jama leaving, Mr. Warsame had a conversation with Jama in which Jama said he was the only one who was still serious about leaving for Syria.  Mr. Warsame told him that the best thing for him to do was to do a test flight to anywhere in the U.S. to see if he could travel. Then if he could travel, he should take a bus from Minneapolis to New York and fly out of JFK.  Jama successfully flew to Chicago and back so he knew he could fly.  He then booked a bus to New York and a ticket from New York to Turkey.  Mr. Warsame helped him print his itinerary at the library.  Mr. Warsame subsequently received a call from Jama, stating that he had made it to Turkey, but did not have an ISIL contact person.  At first Mr. Warsame did not believe him, but eventually, Mr. Warsame contacted Bashir, who had contact numbers for ISIL personnel in Turkey, and Mr. Warsame passed that number on to Jama. *T. 41-45.*

In July 2014, Mr. Warsame, with encouragement from his family, moved to Chicago to live with his father, in part to get away from the co-conspirators.  However, in

6

PDF created with pdfFactory trial version www.pdffactory.com

August of 2014, he came back on a single occasion and played paintball with some of the co-conspirators.  He has stated he didn't really think of the paintball as training for battle. During the summer, Mr. Warsame was in touch with Nur, who was fighting in Syria through the messaging app Surespot, and discussed fighting with ISIL in Syria and what it was like. *T. 47-48.*

After he moved to Chicago, Mr. Warsame still wanted to go to Syria, but he also had serious doubts about whether he wanted to go to Syria.  The videos he had watched were enticing; they made him feel as if he were a part of something bigger.  But there was also a lack of interest and fear.    Mr. Warsame received his passport in August of 2014, but did not try and leave.  He had not settled on any particular path yet.

The first week of October, Daud, Mohamed Farah and Musse, with two other people who are not part of the conspiracy went to visit Mr. Warsame in Chicago.  The visit was to go shopping at a store in Chicago that had outfits to wear during the Eid Muslim holiday.  The trip was just for a day or two.  Farah told Mr. Warsame that Nur's nephew, Mohamed Roble, made it to Syria and joined his uncle to fight for ISIL.  *T. Volume II, 16-19.*

In November 2014, Mr. Warsame received a snapchat video message from Mohamed Farah stating that he was traveling to New York to take a flight out of the country, and the first leg of his bus trip was to Chicago where he was going to change buses to go to New York.  Farah in the video message had luggage, and wanted to know if Mr. Warsame wanted to meet him at the bus station.  Mr. Warsame skipped school that

PDF created with pdfFactory trial version www.pdffactory.com

morning and met Farah at the bus station.  When he arrived at the Chicago bus station, he met Farah and Hamza Ahmed there.  He did not know that Ahmed was going to be there, and did not even know that Ahmed was interested in traveling to Syria or was part of the group.  They ate at the bus station for about ½ an hour, and then Farah and Ahmed boarded their bus to New York.  Prior to the call from Farah, Mr. Warsame did not know about the travel plans and did not know who was going to New York to board a plane.  The physical and communicative separation from the group kept him largely out of the loop.  Zacharia Abdurahman called him the next day and said he was coming to Chicago for a few days.  When Abdurahman got to Chicago, Mr. Warsame learned that they were taken off the plane in New York and not allowed to travel.  While at Abdurahman's Aunt's house, Abdurahman's father came over.  He had driven from Minnesota to retrieve Abdurahman.  He was not happy.  Abdurahman went home to Minnesota with his father. *T. Volume II, 20-22.*

In December 2014/January 2015, Mr. Warsame came to Minnesota for winter break.  Mr. Warsame talked with Omar, who told him that his travel plans were not working out.  Omar tried to travel to San Diego in December 2014, and was stopped by the FBI, so Omar did not think that his travel plans would work. *T. Volume II, 26.*

In April 2015, Mr. Warsame came to Minnesota during a break in his school.  During this time, Bashir had begun working with the Government and recorded conversations between the co-conspirators, including Mr. Warsame.  Mr. Warsame is on a few of these recordings. During one of the conversations, Mr. Warsame encouraged

PDF created with pdfFactory trial version www.pdffactory.com

Omar to try again to go to Syria.  Mr. Warsame knew in general terms that the co-conspirators wanted to travel to Syria, but was not told by any of them about specific plans, including the fake passport scheme.  Mr. Warsame returned to Chicago on April 8 or 9th.  *T. Volume II, 36-44.*

Between April 2015 and December 9, 2015, there is no evidence that Mr. Warsame did anything to further the conspiracy.  Mr. Warsame moved back to Minnesota in July of 2015 to help his mother support the family.  He got a job and resumed school again and was trying to live his life.  In July of 2015, he visited Omar at the jail and sometime after the others were arrested in April of 2015, Mr. Warsame posted something on Twitter like "free the brothers" or something like that, but there is no evidence that he did anything substantive during this eight month period.

### *c. Conduct Subsequent to arrest.*

Mr. Warsame was arrested on December 9, 2015.  After consultation with counsel, Mr. Warsame agreed to an extension of 30 days for the government to seek an Indictment so that he could review the evidence against him and make a decision regarding whether he would plead guilty and if so, whether he would also be ready, willing and able to cooperate with the government in its investigation into members of Mr. Warsame's own community.  Very shortly after a meeting with the government, Mr. Warsame agreed to plead guilty and cooperate.  That decision was made in consultation with his family with whom he was allowed to speak prior to making this important decision.  The family

PDF created with pdfFactory trial version www.pdffactory.com

unanimously recommended that he cooperate with the government and enter a prompt guilty plea.

Shortly after the family meeting, Mr. Warsame told the government that he would plead guilty to a material support charge and cooperate with the government. Thus, less than 44 days after his initial arrest, Mr. Warsame met with the government on January 22, 2016, for one of many proffer sessions. Mr. Warsame entered a guilty plea in front of Judge Davis on February 11, 2016. Several additional lengthy proffer sessions took place on January 27, February 2 and March 2. Each lasted many hours and involved questions requiring painstakingly detailed responses. In every such circumstance, Mr. Warsame rose to the occasion providing truthful and accurate memories to illuminate the prosecution's understanding of Mr. Warsame's and others participation in the offenses charged. And this was the case from the first time he met with the government to each and every time thereafter.

Mr. Warsame has described the period when he was meeting with the government and hearing recordings of his participation as a dark time: "I couldn't stand being in there any longer, listening to the very person I used to be. I became depressed, not eating meals and locking myself in myself. I was at my lowest point in life." But he also knew that what he was doing was the right thing, even as his feet grew cold prior to testifying for fear of what it would cost him and his family for him to testify against his "friends." But he set aside his worries about the backlash against his family and him from his co-

10

PDF created with pdfFactory trial version www.pdffactory.com

defendants' families and other members of his community and continued ahead. He knew what he had to do.

### d. Mr. Warsame's Trial Testimony

Mr. Warsame met with the government several times to prepare to testify at the trial of his codefendants, Guled Omar, Mohamed Farah, and Abdirahman Daud including a session in the evening during the trial as his testimony neared. Of course, this Court is aware that Mr. Warsame testified over the course of two days during the trial of several of his co-defendants. As this Court is aware, there was dissension among community members regarding Mr. Warsame's decision to testify against his co-defendants. His testimony was not warmly received by many. Nonetheless, he took the stand and testified, sat eye to eye with his "friends" as he offered testimony against them. He was subjected to blistering cross examination, and stood his ground. He described his own conduct and accepted responsibility for it. He described theirs with full knowledge of the cost to him and his family. Any indecision he had regarding his changed path was far in the rearview mirror now; he had charted his course.

### e. The 60 Minutes Interview

In addition to the numerous proffers outlined above and his lengthy testimony at trial, Mr. Warsame subsequently had multiple sessions at the U.S. Attorney's Office to go over questions to determine whether Mr. Warsame would be a good candidate to go on *60 Minutes* for a show the government wanted to do on combating terrorism in the United States. United States Attorney Andrew Luger believed Mr. Warsame's message was an

11

PDF created with pdfFactory trial version www.pdffactory.com

important one and that Mr. Warsame could aptly deliver it.  Mr. Luger approached Mr. Warsame's counsel and asked whether Mr. Warsame would be willing to do the interview.  For his part, Mr. Warsame thought "it would be very stupid to have such an experience and not share it with others."   Mr. Warsame was open and honest about what he did and why he did it.   He was also clear about his message to the youth in the group: "Don't do it.  ISIL propaganda is wrong; it is wrong to kill innocent people, ISIL is using you for its own benefit; and if you do this you will either be killed in battle for no reason or you will spend the rest of your life in prison.  It is not worth it."  The U.S. Attorney's Office was impressed with Mr. Warsame. They scheduled a meeting with the producers of *60 Minutes* who also were very impressed with Mr. Warsame and his story and wanted to do the interview.  The interview with *60 Minutes* took place on October 21, 2016, and it aired on October 30, 2016.

In 10 months, Mr. Warsame had entered a guilty plea, met with the Government numerous times, testified in open court against his friends and people from a tight knit community, and agreed to be broadcast on national television disavowing his past acts and actively discouraging others from traveling down his perilous path.   A clearer indication of a change of heart has seldom been seen in such lightning speed. In each and every one of these different forums, Mr. Warsame was truthful in relating his involvement in those activities identified in the Indictment.

PDF created with pdfFactory trial version www.pdffactory.com

### III.   ARGUMENT AS TO THE SENTENCE TO BE IMPOSED

In *United States v. Booker*, 543 U.S. 220, 245-246 (2005), the United States Supreme Court held that mandatory application of the federal sentencing guidelines is unconstitutional, and that the guidelines should be viewed as merely advisory. Post-*Booker* cases in the United States Supreme Court and the Eighth Circuit Court of Appeals address the power and discretion of the district court in fashioning an appropriate sentence. The guidelines remain a factor in sentencing; however, they are just one factor among many the court must consider in determining a sentence that comports with §3553(a)'s parsimony provision to impose a sentence sufficient, but not greater than necessary to accomplish the sentencing purposes set forth in that statute. *See Kimbrough v. United States*, 552 U.S. 85, 90, 111 (2007). In fashioning a sentence that effectuates this statutory command, courts are required to consider the history and characteristics of the defendant. *United States v. Chase*, 560 F.3d 828 (8th Cir. 2009). After *Booker*, the district courts have flexibility to deviate from the advisory sentencing guideline range to "individualize sentences where necessary" and to "tailor the sentence in light of the statutory concerns other than the advisory guidelines." *United States v. Maloney*, 466 F.3d 663, 668 (8th Cir. 2006). Indeed, it can no longer be disputed that to blindly impose a guideline sentence and ignore the personal circumstances of the defendant and other mitigating factors would result in a sentence at odds with the command of the legislature. *See United States v. Feemster,* 572 F.3d 455 (8th Cir. 2009).

PDF created with pdfFactory trial version www.pdffactory.com

A sentencing court must consider the following factors as set forth in 18 U.S.C. § 3553(a) in order to arrive at a sentence:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed-
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.
> (3) the kinds of sentences available;
> (4) the advisory guideline range;
> (5) any pertinent policy statements issued by the Sentencing Commission;
> (6) the need to avoid unwarranted sentence disparities; and
> (7) the need to provide restitution to any victims of the offense.

Upon consideration of these factors, the court then must impose a sentence that is sufficient, but no greater than necessary to satisfy the purposes of sentencing, to wit, "just punishment, deterrence,  protection of the public and the rehabilitation of the defendant." *United States v. Lupton*, 2009 WL 1886007, *1, 4 (E.D.Wi.). The sentencing judge's responsibility, then, has become to "canvass all of the many features of the case that bear on the culpability of the defendant." *See United States v. Ovid*, 2010 W.L. 3940724, *1, 6 (E.D.N.Y). Some of these features have been considered by the Sentencing Commission, some have not. Nonetheless, this court's consideration must be guided by the overarching explicitly stated command that the ultimate sentence to be imposed should be no greater than necessary to satisfy the statutory purposes of sentencing.

14

PDF created with pdfFactory trial version www.pdffactory.com

After consideration of all of the mitigating factors in this case, Mr. Warsame respectfully suggests that a sentence of 18 months is a sentence that would carry out Congress' directives as to sentencing.

A. **The Nature and Circumstances of the Offense Support the Sentence Sought by the Defendant**

Congress directs this Court to examine the nature and circumstances of the offense as one factor in arriving at a just sentence.

In examining the nature and circumstances of the offense, this Court must evaluate Mr. Warsame's individual actions, not those of the conspiracy as a whole remaining mindful that the Court ought not adopt "the darkest possible interpretation of a defendant's conduct and potential and then sentence the defendant as if that interpretation is truth. *United States v. Bell*, Sentencing Order, Court file 13 CR 141-J-32JRK, 23, *quoting United States v. Warsame*, 651 F.Supp.2d 978, 981 (D. Minn. 2009). The Court in *Bell*, in particular, measured the seriousness of the nature and circumstances of the defendant's offense by reference to the actions he took both in the United States and abroad. *Bell*, *supra*, at 37.

In assessing Mr. Warsame's conduct, several factors are noteworthy. Unlike his co-defendants,

1. *Mr. Warsame never traveled or attempted to travel outside of the United States.* He had a passport. He had multiple opportunities to join those who did travel or attempt to travel, but he never went.

15

PDF created with pdfFactory trial version www.pdffactory.com

2. *Mr. Warsame attempted to put physical distance between himself and his co-defendants to help put an end to his indecision.* To be sure, Mr. Warsame wanted to put distance between himself and his codefendants with the naive hope that the physical distance would give him the psychological distance he needed to separate from the group. He was wrong and he did not cut his ties.

3. Mr. Warsame's participation in the conspiracy was heavy on words and light on action and Mr. Warsame's conduct occurred entirely within the United States.

4. There can be little debate that Mr. Warsame was scarcely involved, if at all, by mid-late 2015 evidenced by his waxing and waning.

5. Mr. Warsame was entirely truthful with the government from day one.

This is not to say that Mr. Warsame's actions and words did not carry with them serious ramifications. They did and he knows it. But if this court is to look for mitigation, as the parsimony provision indirectly commands, it must look not only at what he did, but what he refrained from doing and what that indicates about his state of mind in the 2015 time frame; a time of waxing and waning interest and commitment. *See Bell*, *supra*, at 28, 37. Even if this court tarries on this issue, it is clear that Mr. Warsame's unequivocal intention to disavow ISIL and any commitment to its cause is best demonstrated by each and every step he took from the day he was charged in late 2015 until the day he stands before this Court for sentencing as set forth in greater detail in the next section of this Memorandum.

16

PDF created with pdfFactory trial version www.pdffactory.com

B. **Mr. Warsame's post-offense conduct both in and outside the courtroom demonstrates a true change of heart and mind.**

This Court should place great emphasis on Mr. Warsame's post-offense conduct in this matter in order to properly adjudge what risks, if any, Mr. Warsame presents to the public as well as the need for deterrence. What the Court will find is that there is an abundance of evidence that Mr. Warsame has experienced a meaningful change of heart and mind and represents little risk for future offending.

Courts have not been hesitant to credit a defendant's efforts at rehabilitation favorably in a §3553 analysis. *See United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008)(noting that the potential for rehabilitation may provide "grist for the sentencing court's mill"). Further, the court in *Martin* held that support from family and community, coupled with an interpersonal metamorphosis such as the defendant experienced in *Martin*, gave possibility to "meaningful rehabilitation which rises to the level meriting some weight in the section 3553(a) analysis." *Martin*, 520 F.3d at 94. Such a holding is with good reason: a defendant who demonstrates rehabilitation and has community support to maintain his rehabilitated state represents neither a danger to the community nor an offender who needs significant correcting. In just such a case, the parsimony provision of §3553 may have its greatest significance.

In the present case, this Court has ample evidence that Mr. Warsame has significantly and unequivocally changed his heart and mind starting with his arrest on December 9, 2015, less than a year ago. Less than 44 days after his initial arrest, Mr.

17

PDF created with pdfFactory trial version www.pdffactory.com

Warsame met with the government for one of many proffer sessions.  Mr. Warsame entered a guilty plea in front of this Court on February 11, 2016.  Thereafter, there were several additional lengthy proffer sessions; each lasted many hours and involved questions requiring painstakingly detailed responses. His memory and truthfulness were tested at every turn and he passed without equivocation. Indeed, in every such circumstance, Mr. Warsame rose to the occasion providing truthful and accurate narratives to help the government in its understanding of his own and others' participation in the offenses charged.

Moreover, he has publicly disavowed ISIL and his involvement in this conspiracy. In the first instance, he testified over the course of days against his codefendants during the trial of this matter.  In an open courtroom filled with reporters and family members of his co-defendants, Mr. Warsame took the stand and related in detail his participation with others in this offense.  He was subjected to fierce cross-examination and unquestionably, scorn for the perceived betrayal by those from within his community.  The tension was extraordinarily high.  His willingness to testify against his codefendants fractured parts of his community and even unearthed, and then strained his own family bonds, as this court is aware. His family has been shunned by some for their son's willingness to work for the government.

The enormity of these public acts is further punctuated by his actions thereafter. When approached by the government with a suggestion of being a Somali youth spokesperson against ISIL for a segment on *60 Minutes*, Mr. Warsame did not cower or

PDF created with pdfFactory trial version www.pdffactory.com

turn the other direction.  Instead, he turned directly toward the discomfort attendant to more interviews, more questioning, and full knowledge of what he was potentially exposing himself and his family to and he accepted the invitation.

These public acts of disavowal are legally significant because they bear directly on the need to protect the public from future acts of this defendant as well as for reasons of general deterrence.  On this subject, the district court in *Bell* specifically credited Bell's willingness to personally and publicly reject his own past statements and actions vocally during *the sentencing hearing* as evidence that Bell had become rehabilitated. *Bell*, *supra* at 39.  To support its observation, the Court noted that the testifying expert in Bell's case had specifically observed that "committed terrorists often cannot bring themselves to even act remorseful, but use court appearances as venues to reaffirm their views regardless of the ill effect on their sentence." *Id.* at n. 26. [2]

It has been consistently recognized that acceptance of responsibility and rehabilitative efforts bear directly on the likelihood of recidivating.  The court in *United States v. Lupton*, observed that one who faces up to his conduct and takes the first steps to better his behavior in the future is deserving of less punishment because such actions directly reflect on the likelihood of recidivism.  *United States v. Lupton*, 2009 WL 1886007, 1 *11 (D.WI).   Mr. Warsame entered a plea in this matter saving the

---

[2] The defendant understands that Mr. Koehler came to a different conclusion.  The defendant respectfully submits that Mr. Koehler's conclusions are of limited value since the investigative interview upon which his opinion is based took place before Mr. Warsame testified in open court, before the open and obvious fracture in his family and parts of his community that resulted therefrom, and before he evinced a continued willingness to go on national television to specifically disavow his own acts.

19

PDF created with pdfFactory trial version www.pdffactory.com

government considerable time, effort and expense in prosecuting the case. Furthermore, he readily admitted his conduct in this offense and made efforts, to the extent possible, to make amends. He cooperated with the Government in its prosecution of others and made himself available to prepare to testify and did testify. These efforts to correct his behavior and right his wrongs bear directly on his likelihood of recidivating and suggest a lower sentence is appropriate. In this regard, the court in *United States v. Milne* specifically noted that the defendant's acceptance of his responsibility in the offense is important sentencing consideration because:

> such conduct bears directly on their character, §3553(a)(1), and on how severe a sentence is necessary to provide deterrence and punishment, §3553(a)(2). Further, courts should encourage offenders to mitigate their misconduct voluntarily, whether by admitting it, paying restitution or making efforts to address substance abuse, mental health or other problems that contributed to it. *Milne*, 384 F.Supp.2d at 1312.

Mr. Warsame's full and unequivocal acceptance of responsibility for his criminal actions strongly suggests that he represents a low risk of recidivating.

Mr. Warsame's willingness to disavow ISIL and his past actions is far more relevant to the need for punishment and likelihood of recidivism than the statement given weight in *Bell*. Bell was credited for statements made at the 11th hour, at his sentencing hearing. Mr. Warsame started out, continued to, and will end his involvement in this matter by owning his conduct fully and truthfully. He did it publicly at a trial and even more openly in his 60 Minutes interview. Of note, this Court is well aware of the chasm occasioned by Mr. Warsame's testimony within his own community and family.

PDF created with pdfFactory trial version www.pdffactory.com

Nonetheless, Mr. Warsame pressed on with full knowledge that it would make things more difficult for him. Moreover, the consistency and longevity with which he has evinced that changed heart *by his actions* is telling as to the direction his allegiances were tipping even before his arrest in December 2015.

Finally, and not insignificantly, Mr. Warsame's change of heart has significant support in his own family members who have stood with him during this difficult time. His mother, Deqa Hussen, for example has joined *Parents for Peace*, a group whose mission is "to translate the pain of parents into a positive way moving forward, enabling struggling families to break the silence and effectively safeguard their children from the lure of extremist ideologies. The hope is to help families divert loved ones from a path that can lead to violence and heartbreak." [3] In addition, Ms. Hussen recently spoke at the U.S. Attorney's Office 2016 National Security Conference at MIT in an effort to not only share her knowledge, but to put a real face to those families who are fighting the pull of ISIL and other extremist groups.  Her own actions help assure this Court of the support that Mr. Warsame's changed heart and mind will receive from his own family members.

Mr. Warsame's post-offense conduct shows a consistent pattern of being truthful, transparent, and open, even when it hurt him within his family or community.  The changes that Mr. Warsame has made are well supported by his family members who are demonstrating a commitment to get the word out regarding extremist groups in the

---

[3]  This Court can learn more about Parents for Peace at www.parents4peace.org

PDF created with pdfFactory trial version www.pdffactory.com

Somali Community.  This changed heart and mind and the support Mr. Warsame receives to maintain that state are worthy sentencing considerations.

**C.   Mr. Warsame's youth at the time of his involvement undermines the wisdom of the applying the automatic enhancement to criminal history that attends the application of U.S.S.G. §3A 1.4.**

U.S.S.G.  §3A1.4 operates to increase Mr. Warsame's criminal history to the maximum criminal history score in this case despite the fact that he has, in fact, no criminal history.  Although this automatic enhancement textually applies, its application in this case involving a defendant who became involved in this offense at age 19 overstates the seriousness of Mr. Warsame's past criminal conduct and the likelihood that he will commit other crimes.

Courts have consistently recognized youth as an important factor in assessing criminal culpability recognizing the maturity-related impairment in decision making that attends youth. *Miller v. Alabama,* 132 S.Ct. 2455 (2012).   Youth does not absolve a young person of their responsibility for committing an offense.  It does; however, reduce their overall level of culpability.   And for good reason-- it is widely accepted that the "brain continues to develop throughout adolescence and young adulthood in precisely the areas and systems that are regarded as most involved in impulse control, planning, and self regulation."    *Miller   v.   Alabama*, Amicus Curiae Brief for the American Psychological Association, et al, 10-9646, 10-9647, p.10).  Furthermore, the character of a juvenile is one that is malleable and subject to change far more than that of an older

PDF created with pdfFactory trial version www.pdffactory.com

adult.  *Id.* at 19.   Thus, their "actions are less likely to be evidence of 'irretrievably depraved character and they are more capable of making significant change.  *Id. citing Graham v. Florida*, 130 S.Ct. 2011, 2026(2010).  And although Mr. Warsame was 19 at the time he committed the instant offenses, "science cannot draw bright lines precisely demarcating the boundaries between childhood, adolescence, and adulthood; the qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Miller v. Alabama*, <u>Amicus Curiae Brief for the American Psychological Association, et al</u>, 10-9646, 10-9647, at n. 3, *quoting Roper v. Simmons*, 543 U.S. 551, 574(2005).  It is sufficient, for our purposes, to observe that Mr. Warsame was exceedingly immature and aged 19 when he became involved in the instant offense.

These realities make it particularly ill-advised to unthinkingly apply, with nary a sideways glance, the automatic enhancement to criminal history that is part and parcel of the terrorism enhancements provided by the guidelines. That guideline adjustment treats a defendant, like Mr. Warsame, who has no criminal history as if he were a hardened criminal offender who has amassed an amazing number of criminal history points over his career of lawlessness.  This hypothetical hardened criminal offender is one who despite having been incarcerated numerous times, continues to reoffend.  What does he and Mr. Warsame have in common?  The answer is "nothing."  They have nothing in common. Thus, there is ample reason to question the applicability of this automatic enhancement which puts a very young offender with no criminal history on equal footing with our hardened hypothetical criminal with a lifetime worth of unrepentant lawlessness

PDF created with pdfFactory trial version www.pdffactory.com

under his belt.  In fact, courts have refused to apply the *career offender guideline* to a youthful offender for just that reason.

In *United States v. Naylor*, for example, although the defendant had nine prior convictions that would have technically classified him as a career offender, the district court imposed a non-career offender guideline sentence.  359 F.Supp.2d 521, 524 (W.D.Va. 2005).  In refusing to apply the career offender guideline, the court relied on the defendant's youth when he committed the predicate offenses noting as justification, the different levels of moral culpability attendant to young age.  *Id., citing Roper v. Simmons*, 125 S.Ct.1183, 1194-96 (2005).  In this regard, the court pointed to the underdeveloped sense of responsibility and vulnerability to peer pressure that attends youth as justification to avoid the guideline sentence.  *Naylor*, 359 F.Supp.2d at 524.

Although *Naylor* is not a perfect fit, it is instructive nonetheless if only to support this Court's decision to say that the broad sweep of the automatic enhancement for criminal history ought not apply in this case involving offense conduct that occurred as a young adult.  It makes no sense whatsoever to slide one's finger across the page to the place where the highest criminal history level VI is located and mechanically determine that it is just when sentencing a young offender who by virtue of his age is high on impulsivity and low on control.  After all, the young offender's behavior has been corrected previously, if at all, by his parents or perhaps school personnel, not by repeated periods of imprisonment.  *See United States v. Serrano*, 2005 WL 1214314, *1, 8(S.D.N.Y.)(imposing non-guideline sentence where the defendant "career offender" had

24

PDF created with pdfFactory trial version www.pdffactory.com

never spent more than one year in prison); *United States v. Patzer,* 548 F.Supp.2d 612, 616-617 (N.D. Ill. 2008)(imposing non-guideline sentence to "career offender" because of huge chasm between length of prior previous incarceration and guideline sentence)(collecting cases). We treat the career offender harshly, at least in theory, because despite his prior periods of incarceration, he has been unable to conform his conduct to the laws governing our orderly society. He is possibly "irretrievably depraved" within the meaning of the Court in *Miller*.  But the youthful offender with no criminal history is a different breed altogether.  He has not had an opportunity yet to repent. He is more malleable than his hardened counterpart even though the guidelines would treat him identically, in this case, for no reason other than Mr. Warsame committed the predicate offense.  The Guideline greatly exaggerates Mr. Warsame's criminality and the likelihood that he will commit future offenses.  Although it textually applies, in spirit and application, it fails.

This failure on the part of the Guidelines is a worthy sentencing consideration that supports Mr. Warsame's request for a sentence of 18 months.

PDF created with pdfFactory trial version www.pdffactory.com

**D. An apple to apple comparison of similarly situated defendants supports the sentence sought by Mr. Warsame.**

A true comparison of similarly situated defendants shows the propriety of the 18-month sentence sought by Mr. Warsame.

In order to reduce sentencing disparities, this Court must examine sentences that this and other district courts have handed down to similarly situated defendants. 18 U.S.C. § 3553. In doing so, the Court must be mindful of comparing "apples to apples" and not draw comparisons to cases involving defendants who were convicted of multiple counts, who did not cooperate with the government, who went through trial, had extensive criminal histories or who were convicted of more serious offenses. *United States v. Bell, supra*, p. 31. "Congress clearly thought it appropriate that defendants who provide substantial assistance should receive lower sentences than would otherwise be imposed." *United States v. Jimenez-Gutierrez,* 425 F.3d 1123, 1127 (8th Cir.2005) (Colloton, J., concurring). Sentencing disparities between a defendant who provides substantial assistance and one who does not are not "unwarranted." *United States v. Gallagos*, 480 F.3d 856 (8th Cir. 2007).

Below appears a table of comparison cases with similar offense profiles as the case before the court presented in summary form. Each case will be discussed below.

PDF created with pdfFactory trial version www.pdffactory.com

Similar Cases to *United States v. Warsame:  Profile:  Single Count and 5K*

| Case | Facts | Guidelines | Sentence |
|------|-------|------------|----------|
| *United States v. Ahmed Mahamud* CR-11-191 (D. Minn. 2013) One count §2339(B)(a)(1) | Gave Money Did not travel Resolved Quickly Met with Government | Offense level:  37 CH:  VI Subject to 15 year stat Max | 36 months 20 years supervised release |
| *United States v. Abdi Fatah Isse* CR-09-50 (D.Minn. 2013) One Count §2339A(a) | Traveled to Somalia Received weapons training Purchased an AK-47 Raised money for Ak-47 for others. Prepared training camp in Kamsuma Was not initially truthful Gave contact information. Lengthy delay in sentencing | 15 year stat. max | 36 months 20 years supervised release |
| *United States v. Shannon Conley* CR-14-163 (D. Colo. 2014) One Count 18 U.S.C. §371 | Boyfriend was in Al Qaeda/ISIL She trained in the United States to Obtain skills to use firearms through U.S. Army Explorers; Attempted to travel To Turkey Practiced shooting | GL:  292-365  5 year max | 48 months |

*Source:* Plea petition, the parties respective sentencing positions, and sentencing hearing transcripts.

27

PDF created with pdfFactory trial version www.pdffactory.com

*United States v. Mahamud* (Cr-11-191)(D. Minn.).

In 2013, this Court sentenced the defendant in *United States v. Mahamud*, a case that has substantial similarities to Mr. Warsame's case. Mahamud entered a guilty plea to providing material assistance to Al-Shabaab. The defendant in *Mahamud* solicited money during four separate fund raising events in order to provide funds for his co-conspirators to travel from Minnesota to Somalia. During these fundraising events, he told people he was raising money for Somali orphans. In addition, he wired $100 by means of two wire transfers so that a member of Al Shabaab, Abdikadir Abdi, could purchase a firearm. He also solicited another individual in California to provide funds to Abdikadir Abdi. Mr. Mahamud never traveled or attempted to travel outside of the United States.

Mr. Mahamud proffered with the government and testified during the trial of one of his codefendants. This Court sentenced him to 36 months incarceration after granting the government's motion for a 5k1.1 for substantial assistance to the government.

*United States v. Abdifatah Isse* (CR-09-50)(D. Minn.)

That same year, this Court sentenced Abdifatah Isse, another §5K 1.1 case with similarities to Mr. Warsame's case, but more serious offense conduct. Like Mahamud, Isse entered a guilty plea to providing substantial assistance to Al Shabaab. From a review of the records, it appears that Mr. Isse spent a substantial amount of time in Somalia, traveling first to Mogadishu and then to a safe house in Marka. While in Marka, he raised money for an AK-47. Thereafter, he accepted his own AK-47 from

28

PDF created with pdfFactory trial version www.pdffactory.com

members of Al-Shabaab.  From there, Isse went to work in a jihadist camp for about a week before leaving for another part of Somalia of his own volition.  He returned to the United States and had further contact with people in Somalia including both phone calls and sending money.  Isse was arrested while on his way to board a flight for a trip to Tanzania.

Mr. Isse substantially cooperated with the government and testified during the trial of one of his codefendants. It appears that Mr. Isse was not immediately forthcoming, but relatively quickly became truthful during the course of his proffer sessions.  This Court sentenced him to 36 months incarceration after granting the government's motion for a 5k1.1 for substantial assistance to the government.

_United States v. Shannon Conley_ (CR-14-163)(D. Colo.).

In 2015, a federal district court in the District of Colorado sentenced Conley for conspiracy to provide material assistance to Al-Qaeda.  Conley became engaged to an Al-Quaeda fighter and agreed to travel to Syria.  She agreed, as part of her preparation, to join the U.S. Army Explorers in order to get training in firearms and military tactics.  She obtained her training and purchased an airline ticket to Turkey.  She was arrested at the Denver airport and was found with various certificates which showed her proficiency in USAE, first aid and nursing training, NRA certification, and a first aid manual.  She also was found to possess, in her home, shooting targets that noted the number of rounds fired and distances.

PDF created with pdfFactory trial version www.pdffactory.com

Conley cooperated with the government although the extent of her cooperation is unknown.  It does not appear that she testified.  The court sentenced Conley to 48 months incarceration.

These cases set some guideposts that this court can follow.  In the first two cases, the statutory max represented the guideline sentence just as in Mr. Warsame's case.  Like the defendant in *Mahamud* who never traveled and received a sentence of 36 months, likewise Mr. Warsame never traveled.  The conduct in all three cases, *Mahamud*, *Isse* and *Conley* is more serious than the present case.   Although Mr. Warsame sold his telephone to provide money to one of his codefendants to expedite his passport, he never raised money directly to benefit ISIL or to purchase weapons, as in *Mahamud*; never did special training to prepare him to fight, like in *Conley*, or ever traveled for any purpose related to advancing ISIL, as in *Isse* and *Conley*.  In fact, despite having numerous opportunities to attempt to do so, Mr. Warsame stayed here. Moreover, Mr. Warsame's cooperation and willingness to publicly disavow ISIL is plainly distinguishable from all three cases except perhaps, *Isse*, given the extent to which that defendant met and proffered with the government.  In short, these cases are similar enough to Mr. Warsame's to shed light on an appropriate sentence, but each of these cases is factually more serious.  Thus, they represent more of a ceiling to sentencing discretion than a blueprint for the floor.

PDF created with pdfFactory trial version www.pdffactory.com

**E.     An 18 month sentence is appropriate because it is proportionate under the circumstances and will hasten Mr. Warsame's access to deradicalization programs.**

Having provided the court with ample reasons why a non-guideline sentence is appropriate, the remaining question is, what sentence is "sufficient, but not greater than necessary to comply with the purposes of sentencing outlined in 18 U.S.C. § 3553?"  Mr. Warsame respectfully suggests that a sentence of 18 months would satisfy the statutory purposes of sentencing.  His position finds support in the cases he has previously cited to this court as well as the extent of his cooperation and what it means in terms of his change of heart and mind and the assistance he provided to the government.

Further, this period of incarceration will be followed by a lengthy period of supervision during which Mr. Warsame will participate in one of the programs identified by the Court to facilitate his rehabilitation.  Mr. Koehler made two things clear during his testimony, to wit, that there are no deradicalization programs in prison and that a lengthy period of time without programming is detrimental to the defendant and adverse to community safety.  Thus, Mr. Warsame's best expected outcome will be achieved only after he is out of custody and has completed programming.

A lengthy period of intense supervision over Mr. Warsame's life will allow the court to monitor his life and intervene if Mr. Warsame chooses a life that is inconsistent with the changes he has made in the last year. Giving him a first "second chance" by sentencing him to a sentence of 18 months is both called for under the unusual facts of

31

PDF created with pdfFactory trial version www.pdffactory.com

this case and an appropriate balancing of those sentencing factors identified by Congress as mandated to guide this Court's considerable discretion.

CONLUSION

In her book, *Bird by Bird,* author Anne Lamott has poignantly observed that, "if you don't change directions, you are going to end up where you are headed."  Mr. Warsame has truly and sincerely changed directions as a direct result of this offense.  Mr. Warsame's honest effort to change his path is his first step toward setting an entirely new course.

For the reasons set forth above, Mr. Warsame respectfully requests that this Court sentence him to 18 months in custody.

Respectfully submitted,

**SICOLI LAW, LTD.**

Dated:  11/3/2016 _         s/ Robert D. Sicoli         
Robert D. Sicoli
333 South Seventh Street
Suite 2350
Minneapolis, MN 55402
Telephone:  (612) 871-0708
Reg. No. 178238

Sarah M. MacGillis
333 S. 4th Street, Ste. 2350
Minneapolis, MN 55402
Telephone:  (612) 455-1034
Reg. No. 282017

ATTORNEYS FOR DEFENDANT
ABDIRIZAK MOHAMED WARSAME

32

PDF created with pdfFactory trial version www.pdffactory.com