UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 16-37 (MJD/FLN)

UNITED STATES OF AMERICA,

          Plaintiff,

                         **SENTENCING POSITION OF THE**
     v.                     **UNITED STATES OF AMERICA**

ABDIRIZAK MOHAMED WARSAME,

          Defendant.

      The United States of America, through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Assistant United States Attorneys John Docherty, Andrew R. Winter, and Julie E. Allyn, respectfully submits its Sentencing Position in this case. The starting point for determining an appropriate sentence in this case is consideration of all the facts of the case, as well as the United States Sentencing Guidelines (hereinafter referred to as the "U.S.S.G."), and the factors set forth at Title 18, United States Code, Section 3553(a). The United States will be making a motion, pursuant to U.S.S.G. § 5K1.1, for a downward departure on the grounds of substantial assistance, and will be seeking a significant reduction from the advisory guidelines sentence of fifteen years' imprisonment. The government respectfully represents that a sentence of 54 months' imprisonment would be a just sentence in this case.

      The 54-month duration is derived from sentences imposed on cooperating defendants in earlier material support prosecutions before this Court. Following the trial of *United States v. Mahamud Said Omar* in 2012-2013, cooperating defendants Salah

Ahmed and Abdifatah Isse were each sentenced to 36 months in prison by this Court. The government sees Defendant Warsame as relatively similar to those defendants in that earlier case, with two important differences: First, neither Salah or Isse were ever leaders, they were recruits, unlike Warsame who was elected emir at one point and provided assistance to other coconspirators so they could successfully travel to join ISIL; Second, the government views ISIL as a significantly more dangerous terrorist organization than al Shabaab. The government premises this conclusion on the mass casualty terror attacks that ISIL has perpetrated in Paris, Nice, Brussels, Beirut, and, most tellingly, San Bernardino; al Shabaab has never attacked the United States.

In all, and as described fully below, the government believes a sentence of 54 months – 18 months longer that that imposed on Salah and Isse, and 12 months longer than the government's recommended sentence for coconspirator Yusuf, appropriately accounts for the difference in culpability and avoids unwarranted disparity.

## I.    INTRODUCTION

Defendant Abdirizak Mohamed Warsame ("Defendant") was arrested on December 9, 2015. On February 11, 2016, Defendant pled guilty to a one-count Information charging him with Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B(a)(1). (PSR ¶ 1).

Several of Defendant's coconspirators proceeded to trial. The evidence in the record and at the trial showed a large, long-term conspiracy that contained within it three distinct efforts by the conspirators to reach Syria, where they would join, and fight for ISIL – one attempt in the Spring of 2014, which resulted in two travelers reaching Syria, while a third

traveler was denied boarding at the airport by law enforcement, and still others were prevented from traveling by family; a second attempt, in the Fall of 2014, in which five travelers tried to reach Syria, but all were denied boarding at either Minneapolis – Saint Paul International Airport or John F. Kennedy International Airport in New York City; and a third and final attempt, in the Spring of 2015, in which two conspirators tried to reach Syria via Mexico after driving to San Diego, California, to buy fake passports, then planned to use those fake passports to cross into Mexico, from where they would make their way to Syria. This third attempt was unsuccessful, and resulted in the arrest of six of Defendant's coconspirators who were subsequently charged in a separate case.

A detailed recitation of the facts of the case can be found in Common Appendix A, which is attached to this Sentencing Position, and in the Report of Presentence Investigation ("PSR") prepared by the United States Probation Office.

## II.     THE FACTS OF THE CASE AGAINST DEFENDANT WARSAME

Defendant was a member of this conspiracy at inception – joining in the planning in the Spring of 2014. Defendant thereafter moved to Chicago in the Summer of 2014. Although Defendant still harbored hopes to leave to join ISIL after he moved to Chicago, (and similarly encouraged his friends to join), after he left Minnesota, Warsame was not involved with the specific planning by the coconspirators for their next two attempts to travel to Syria in the Fall of 2014 and then the Spring of 2015.

Shortly after Defendant's arrest, he agreed to cooperate with the government. Defendant's cooperation from the beginning was truthful and detailed. Specifics of Warsame's cooperation will be more fully discussed elsewhere. Ultimately Warsame

testified truthfully over a two-day period at the jury trial of defendants Mohamed Farah, Guled Omar and Abdirahman Daud.   All three of those defendants were convicted following the trial.  The government anticipates filing a motion for a downward departure of Warsame's sentence, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 5K1.1 for the substantial assistance rendered by Warsame.  A detailed letter to the district court judge will be filed together with the 5K1.1 motion, detailing how Defendant's cooperation was significant and assisted in the successful prosecution of this case.

### A. Defendant Warsame's Participation in the Plot to Join ISIL During the Spring of 2014

Defendant testified at length about his own criminal conduct during the trial and the Government views this testimony as extensive and believable.  Defendant testified that he was friends with many of the coconspirators in this case long before they were arrested for conspiring to join ISIL.  This group of friends included co-coconspirators Guled Omar ("Omar"), Abdirahman Daud ("Daud"), and Mohamed Farah.  At some point, and certainly by March 2014, this group of friends coalesced to become a collection of men that were actively discussing the events in Syria without detection.  (Transcript of testimony of Abdirizak Warsame, May 24, 2016, at page 7-9 (hereinafter "Warsame, 5/24/16, Tr. p.")).  Around this time, on March 9, 2014, another man known to the group, Hanad Mohallim ("Mohallim"), left Minnesota to fight for ISIL in Syria.  (Warsame, 5/24/16, Tr. p.7; PSR ¶ 22)).  Mohallim's departure surprised the conspirators because he was younger and appeared to effortlessly leave the United States for Syria.  (PSR ¶ 23; Warsame 5/24/16, Tr. p.14).

4

After Mohallim's successful exit, Warsame and the group, which included Warsame's "good friend" Abdi Nur, met frequently in the Spring of 2014 and narrowed their focus on Syria to be more specifically on ISIL, including watching propaganda videos on-line to learn more about ISIL and jihad.[1] (PSR ¶ 24; Transcript of Defendant Warsame's Change of Plea hearing 2/11/16, (hereinafter "Plea Hrng. Tr.") p. 23; Warsame, 5/24/16 Tr. p. 14-17; Transcript of testimony of Abdullahi Yusuf, 5/13/16, at page 73-74 (hereinafter "Yusuf", 5/13/16, Tr. p.")).  Abdullahi Yusuf ("Yusuf") and Yusuf Jama ("Jama") were also brought into the group about this time.  Omar and Warsame first introduced Jama to members of the group planning travel to Syria in April of 2014 and encouraged him specifically about joining ISIL.  (Yusuf, 5/13/16, Tr. p. 75-76; 104; Warsame 5/24/16, Tr. p. 25-26).

Warsame explained that they had "been watching propaganda videos for some time and we decided it was a time to not only talk, but to put it into some action."  (Plea Hrng. Tr. p.23).  With Guled Omar as their emir (leader), the group began making specific plans to move forward with plots for the men to leave the United States to fight for ISIL.  (PSR ¶ 25).

To leave for Syria to join ISIL, Defendant and the coconspirators needed passports or other travel documents.  Accordingly, in April 2014 Defendant went to the passport

---

[1] The word "jihad" is fraught with the possibility of misunderstanding.  As used in this memorandum, "jihad" means perpetrating acts of violence against non-Muslims, a category that includes many people who are Muslim, but are considered by ISIL to be either insufficiently zealous (most Sunnis), or else to hold beliefs that ISIL does not recognize as Muslim at all (the Shi'a).

agency along with Nur and submitted "expedited" passport applications. (PSR ¶ ¶ 27-30; Plea Hrng. Tr. p. 25).  Defendant, like others, lied on his passport application, claiming he was traveling to Australia with family to hide his true objective.  (Plea Hrng. Tr. p. 25-26). Warsame, however, was unable to obtain his passport in April of 2014 with the others because he lacked all his necessary documentation, and he did not receive his passport until August of 2014.  (PSR ¶ 28).  By that time in August, Warsame had missed his opportunity to travel with the group attempting to leave to join ISIL in the Spring of 2014.

In the meantime, Warsame encouraged and assisted the other coconspirators in their attempts to leave in the Spring of 2014.  For example, Warsame sold his phone to give co-defendant Adnan Farah $200 for his passport application.  And, on two occasions Warsame went shopping for gear for Syria with several coconspirators; one time with Nur, Yusuf, and Mohamed Farah, and another time with Zacharia Abdurahman ("Abdurahman"), Omar, Jama, and Abdirahman Bashir ("Bashir").  (PSR ¶¶ 29, 32, 38).

Eventually the Spring plot included two different plans for the end of May: Omar, Bashir, and Jama, would drive to California and eventually make their way out of the country through Mexico; and Yusuf and Nur would fly from the Minneapolis airport to Turkey.  As Omar was to be one of the men leaving for Syria in May of 2014, Warsame was selected to be the next emir for the group upon Omar's departure.  (PSR ¶ 25).

The plan for Omar, Bashir and Jama to drive through California to Mexico was thwarted by Omar's family.  Jama, however, was undeterred by his initial travel failure, and so he was looking for other methods to leave the United States.  Warsame suggested Jama take a "test trip" to ensure he was not on the no-fly list, and if that worked, Warsame

suggested that when it came time for Jama's real flight out of the country, that he depart from a city other than Minneapolis, like New York City.  (PSR ¶ 39).  Jama followed both these suggestions and successfully left the United States and arrived in Turkey in June 2014.  (PSR ¶ 39).  Upon Jama's arrival in Turkey, he called Warsame, asking him for a number for a contact in Syria.  (PSR ¶ 40).  Warsame did not have such a number, but was able to get that number from Bashir and pass it along to Jama.  Jama, then, successfully made it to Syria and became an ISIL fighter.  (PSR ¶¶ 40-41).

### B. Defendant Warsame's Participation with Conspirators in Summer of 2014

Warsame moved to Chicago in the Summer of 2014 and began to have less interaction with the coconspirators.  The move to Chicago came at the behest of Warsame's family who was worried about Warsame's involvement with his coconspirators following Yusuf's unsuccessful travel attempt, and wanted Warsame to have fewer interactions with this group friends.  (PSR ¶ 43, 185).  To some extent that effort was successful, since after his move, he was never again involved with these coconspirators in their detailed planning to leave the United States to fight for ISIL.

While Warsame lived in Chicago he worked and enrolled in school.  (PSR ¶¶ 198,204).  Although Warsame now had less contact with the coconspirators, he did participate in various social media platforms where either he expressed pro-ISIL beliefs.  (PSR ¶ 74).  For example, Warsame's Facebook page displayed pictures of lions which symbolized bravery associated with ISIL, and he followed Nur's and Omar's pro-jihadist Twitter accounts.  (PSR ¶¶ 78, 79).  Warsame also continued to watch violent ISIL videos

7

during his time in Chicago.  At the same juncture, however, these videos caused Warsame to begin to question ISIL.  For example, Warsame saw the video depicting the burning of the Jordanian pilot while living in Chicago, and this graphic depiction of violence caused him to "rethink a lot of things."  (Warsame, 5/25/16, Tr. p. 73).

### C.  The Fall 2014 Plot of Defendant's Coconspirators

By the Fall of 2014, many of the coconspirators formulated a concrete plan for four of the coconspirators ("JFK 4") to fly from New York City on various flights that could get them to Turkey.  Defendant by this time was sufficiently disengaged from the details of the conspiracy that he was completely unaware of this newest plot.  Defendant did not learn about the latest travel attempt until the night before the plan's execution when Mohamed Farah let Warsame know he would be laying-over in Chicago the following day on his way to New York City via bus.  (PSR ¶ 56).  The next day, Mohamed Farah arrived in Chicago with coconspirator Hamza Ahmed ("Ahmed").  (PSR ¶ 56).  Warsame was "surprised" to see Ahmed with Mohamed Farah, as Warsame had not even known Ahmed was part of the group.  (Warsame, 5/25/16, Tr. p. 21).

Although the three men socialized for a while in Chicago, they did not discuss specifics about the travel attempt.  Warsame, however, knew what Mohamed Farah and Ahmed were attempting to do since he had originated the Turkey-via-JFK plan as a recommendation for Yusuf Jama.  (Warsame, 5/25/16, Tr. p. 20-22).  Ultimately, the JFK 4 failed in their attempt to leave as the FBI stopped them at the airport in New York and the men were sent back home to Minneapolis.

### D. Defendant's Encouragement to his Coconspirators for the Spring of 2015 Plot to Join ISIL

In the Spring of 2015, Warsame was still living in Chicago, still hoping himself to figure out a way to join ISIL, but unaware of the specific plans the other coconspirators were developing to leave for Syria. Although Warsame did not know the specifics of any scheme, he was aware his friends were once again wanting to plan something to leave the United States to join ISIL. (Warsame, 5/25/16, Tr. pgs. 36-37).

In early April 2015, only a few weeks before several of the coconspirators were planning to drive to California to buy the fake passports, Warsame visited Minnesota for a few days. By this time, Bashir was working as a cooperating source and recording conversations among the coconspirators, to include a few conversations with Warsame.

During various recorded conversations, Warsame explained to Bashir and Omar that he believed by May 1st he could travel with his father to Somalia, and from there he would try to make it to Syria. (PSR ¶ 120; Tr. Exhs. 229 (audio), 230 (transcript p. 72)). Warsame and some of the coconspirators even discussed that perhaps by May, al Shabaab would pledge their allegiance to ISIL, so Warsame could remain in Somalia to fight for ISIL rather than travel to Syria. (*Id.*; Tr. 232 (audio), 233 (transcript p. 379)). When Warsame expressed doubt, and said he might need to return to the United States from Somalia, Omar encouraged Warsame to stay and fight in Somalia as there would still be unbelievers on that land: *"Either way, even if they don't, [make the pledge] you're still obliged to fight. You know that right? {It's your obligation} to fight. Because there's kuffar in Muslim lands here and there. That's {duty} for you."* (Tr. Exhs. 229 (audio), 230 (transcript p. 81)).

9

Warsame, in turn, encouraged his friend Omar to leave for Syria, despite Omar expressing reservations about if Spring 2015 was the right time for him to leave. Warsame testified to this encouragement he provided Omar. (Warsame 5/25/16, Tr. 36-37). An example of Warsame's advice is demonstrated in the conversation below between Warsame, Bashir and Omar:[2]

> AW: *So I mean-I think, wallah, you should try it, just be smart about it. Don't be dumb. You know? And know that every move you make, every thought, every single step you take…cuz it's like playing a game of chess, bro, one wo-thing you move you can be in danger, or you could win. And that everything—*
>
> GO: *[OV] [UI] chess*
>
> AW: *—comes with its consequences. You're not good at chess?*
>
> GO: *I am not good at chess, bro.*
>
> AW: *I'm a monster at chess.*
>
> AW: *{Look,} that's not the point, though.*
>
> CHS: *No, you're not.*
>
> AW: *If you know chess, every move you make you can-you can lose or-or win or whatever.*
>
> GO: *I know. That's why I'm [UI]. I'm not good at chess. [UI].*
>
> CHS: *[OV] So why don't you just [UI].*
>
> GO: *[UI] —*
>
> CHS: *[OV] So, where are we at?*
>
> AW: *—all about putting your trust in Allah —*
>
> CHS: *[OV] But that's what we have. Yeah [UI]?*

---

[2] The speakers in the undercover recordings are identified by their initials. "CHS" refers to Bashir.

*AW:* —*Wallahi, Guled, if you make it*—

*UM:* [OV] [UI]

*AW:* —*wallahi, you will give a hundred and—a thousand people {certainty} not only that but you will give them conviction that anybody can do it.*

*GO:* *Wallah, I don't know if I'll survive.*

*AW:* *You will be an inspiration*—

(Trial Exhibits 229 (audio), 230 (transcript p. 144); *see also* PSR ¶ 121.)

Warsame returned to Chicago in early April still unaware of any specific plan by the coconspirators to leave the United States to join ISIL.  On April 19, 2015, shortly after Warsame returned home to Chicago, he learned from the media about the arrests of his friends.  (Warsame, 5/25/16, Tr. p. 44).  Warsame was not arrested until December.

### III.    SENTENCING GUIDELINES

The United States has no objections to either the factual statements or the guidelines calculations contained in the Report of Presentence Investigation prepared by the United States Probation and Pretrial Services Office.

The U.S. Probation Office's Report of Presentence Investigation correctly calculated Defendant's total offense level as 35, and correctly placed him in criminal history category VI. (PSR ¶ ¶ 165, 171).  The resulting guidelines sentence is 292 months to 365 months, but given the maximum sentence allowed by statute of fifteen years, the guideline term of imprisonment is effectively 180 months in prison. (PSR ¶ 210).

This total offense level and criminal history score are high for this defendant in part because of the application of the terrorism enhancement at U.S.S.G. § 3A1.4.  This victim-related, Chapter Three adjustment recognizes that "an act of terrorism represents a

11

particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir.) *cert. denied sub nom. Haouari v. United States*, 538 U.S. 1068 (2003). "We have recognized that 'Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Stewart*, 590 F.3d 93, 143 (2d Cir. 2009) (*quoting Meskini, supra,* 319 F.3d at 92).

## IV.   ARGUMENT

Absent a motion for a downward departure from the United States pursuant to U.S.S.G. § 5K1.1, a guidelines sentence of fifteen years would be appropriate in this case.

In *Gall v. United States,* 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence.  552 U.S. at 49-50; *United States v. Ruvalcava-Perez,* 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors.")

The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented." *Id.* at 50.

12

If the court determines that a sentence outside the Guidelines range is called for, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* Section 3553(a) requires the Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

### A. Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The nature and circumstances of the offense are set forth in detail above and in Common Appendix A. This Defendant now stands convicted of a serious crime involving terrorism. The terrorist organization he sought to assist, ISIL, is one of the most dangerous and violent in existence.

Defendant is a young man with hardly any criminal history. Warsame was born in a refugee camp in Nairobi, Kenya in 1995 and emigrated to the United States as a refugee before he was one years old. (PSR ¶ 176). He graduated high school, has had frequent employment, and has been described as a "role model." (PSR ¶¶ 195, 185). Unfortunately, despite this potential, he sought to join and fight for ISIL.

Warsame was one of the early members of this conspiracy, he dedicated significant time to learning about ISIL and watched their horrific ISIL videos. Warsame was respected

enough in his beliefs to be selected emir had Omar left.  Clearly others turned to him for guidance and advice.

To his credit, Defendant did not lie to the FBI during any interviews or proffers. Similarly, Warsame gave an extremely candid, non-evasive factual basis during his guilty plea to the Court. This stands in contrast to other co-defendants who pled (but did not cooperate), who minimized their role and motives either during their plea colloquies or since entering their guilty pleas.

Since agreeing to cooperate with the Government, Defendant renounced his conduct and those of his coconspirators.  Defendant did not merely denounce those beliefs in a vacuum, but he said so publicly and testified at trial against three childhood friends.

### B. Need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

Defendant Warsame stands before the court convicted of a serious crime involving terrorism.  The Supreme Court has recognized combating terrorism as "an urgent objective of the highest order." *Holder v. Humanitarian Law Project,* 561 U.S. 1, 130 S. Ct. 2705, 2724 (2010).  The seriousness of the offense is difficult to overstate.  Four people, at least, have died in Syria as a result of this conspiracy – Douglas McAuthur McCain, Hanad Mohallim, Abdi Nur, and Yusuf Jama. Further those who join and fight with ISIL can be expected to kill or be killed for ISIL.

In other sentencing position pleadings filed in this case, the government is noting that one reason for imposing a significant sentence in this particular case is that this case was tried in an intimidating atmosphere.  This factor, however, does not apply to the

cooperators like this Defendant because as the one testifying, he was the attempted object of intimidation, and not the one perpetuating the intimidation.

### C. Need for the sentence imposed to afford adequate deterrence to criminal conduct, and the Need for the Sentence Imposed to Protect the Public from Future Crimes of This Defendant.

Individual deterrence discourages a defendant from ever committing such a crime again. General deterrence is necessary to deter other people from committing similar crimes. "Congress specifically made general deterrence an appropriate consideration . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States,* 623 F.3d 627, 632 (8th Cir. 2010) (*quoting United States v. Medearis,* 451 F.3d 918, 920 (8th Cir. 2006)).

In this case, general deterrence remains important, as not too long ago, Minnesota experienced a wave of young men traveling to join al Shabaab, and presumably many of those young men are now dead. Despite these deaths and the surrounding investigation and prosecutions, here yet another group of Minnesota men attempted to leave the United States to become terrorists. General deterrence is necessary to impress upon a certain number of people in the community that know the circumstances, trying to become a terrorist has serious consequences.

The case for individual deterrence, and the case for a sentence that protects the public from further crimes of Defendant, is laid out above in this position pleading and the Appendix. Given Defendant's leadership and guidance role in this conspiracy, but balanced with his willingness to renounce his support and belief in ISIL, a moderate prison term is justified and necessary for deterrence and to protect the public.

D. **The Kinds of Sentences Available, the Need to Avoid Disparities, the Need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**

At this time, it is difficult to identify any particular programming that will benefit Defendant. No such programming is identified by the PSR. As noted by the Court during the hearing held to present the assessments of the court's expert, Daniel Koehler, there is at this time no counter-radicalization programming offered by the Bureau of Prisons. This particular 3553(a) factor appears to be inapplicable to this defendant, though should that change during his term of imprisonment, the government will of course not stand in the way of Defendant receiving any programming.

With respect to the kind of sentences imposed, the United States has submitted a Report concerning sentences imposed on defendants who have traveled overseas, or attempted to travel overseas, in the past two years in support of a designated foreign terrorist organization.

V. **CONCLUSION**

The United States respectfully asks that the Court sentence Defendant in accordance with the sentencing recommendation set forth in the forthcoming U.S.S.G. § 5K1.1 motion. The United States will be recommending a sentence of 54 months, a substantial, but warranted, downward departure from the presumptive advisory guidelines sentence of 180 months. A detailed letter to the district court judge will be filed together with the 5K1.1

motion, detailing Defendant's cooperation and its contribution to the successful prosecution of this case.

Dated: November 3, 2016                    Respectfully Submitted,

                                           ANDREW M. LUGER
                                           United States Attorney

                                           *s/ Julie E. Allyn*

                                           BY:  JULIE E. ALLYN
                                           Assistant United States Attorney
                                           Attorney Reg. No. 256511

                                           ANDREW R. WINTER
                                           Assistant United States Attorney
                                           Attorney Reg. No. 232531

                                           JOHN DOCHERTY
                                           Assistant United States Attorney
                                           Attorney Reg. No. 017516X

## COMMON APPENDIX A – THE SYRIAN INSURRECTION AND ISIL

This Appendix A to the Government's Sentencing Positions describes (a) historical and Syrian current affairs context that is common to all nine Sentencing Positions being submitted to the Court by the government, and (b) a capsule summary of the facts proven at trial. This Appendix is reproduced in each of the government's sentencing positions, and is identical in each. No attempt has been made to write a factual summary that is more comprehensive than the very thorough Reports of Pre-Sentence Investigation written in this case by United States Probation officers. However, this Common Appendix A does go into more detail than the PSRs about the history of the Syrian insurrection, and the role in that insurrection of the designated foreign terrorist organization the Islamic State in Iraq and the Levant, or "ISIL." If there is interplay between events in Syria and events in Minnesota, Common Appendix A tries to correlate events in Syria with significant events that were happening in this case, here in Minnesota, at about the same time as the events in Syria.

As to the first part of Common Appendix A, history and current events, Common Appendix A relies upon the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. Common Appendix A does not summarize all of Mr. Lister's testimony. Instead, it highlights those parts of his testimony which are important to understanding the issues in these sentencings. These matters are a short history of the Syrian insurrection, the origins of ISIL, as well as ISIL's extraordinary brutality and the part such brutality plays in ISIL's recruitment of foreign fighters. Finally, this Common Appendix A concludes with a brief description of ISIL's

1

understanding of the importance, to what in ISIL's view would be an observant Muslim, of participating in the fighting now taking place in Syria.

The second part of Common Appendix A seeks to provide an overview of the facts of the case, and to provide a description of the facts of the case that can be referred to in all of the government's sentencing position papers.

The facts concerning historical background and Syrian current events in Common Appendix A are taken from a transcript of the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. As to other trial facts, which have not yet been transcribed, Common Appendix A relies on the contemporaneous notes of Assistant U.S. Attorneys and FBI Special Agents.

**Developments in Syria from the Arab Spring (2011) to 2013 Abu Musab al-Zarqawi's founding of ISIL (2013)**

Syrian President Bashar al-Assad took power in 2000, continuing the reign of his father, Hafez al-Assad. Between them, the two Presidents al-Assad have ruled Syria as a dictatorship for more than forty years. Bashar al-Assad has used brutal repression against his political opponents, including extensive and intrusive police surveillance followed by arrest, torture, and execution. The efforts of ordinary citizens, during the "Arab Spring," to protest against the regime, were met by the Assad regime with violence.

The Arab Spring began at the end of 2011, and was triggered by a Tunisian man who burned himself to death in a desperate act of protest after being humiliated by the police. The Arab Spring anti-dictatorship movement spread across North Africa and the Middle East in the months that followed.

In Syria, the wealthy had for decades been supporters of the regime.  After Bashar al-Assad took power in 2000, this increased, and the gap between rich and poor in Syria became even more stark than it had been.   When Bashar al-Assad introduced economic liberalization measures, with support given to small businesses, it turned out that the small businesses that received assistance were the small businesses of regime supporters.

On March 6, 2011, the Syrian internal security services arrested 15 schoolboys in the southern Syrian city of Deraa, alleging that they had been chanting revolutionary songs as they walked home from school.  All the boys were tortured, and several of them were killed.  Peaceful protests of the boys' arrest were met by the regime with live ammunition, resulting in several deaths.  Over the next few days, protests spread to numerous Syrian cities.  The arrest and torture of these schoolboys in Deraa, and the regime's heavy-handed response to it, marks the beginning of the Syrian insurrection against President Bashar al-Assad.  The insurrection soon transitioned from peaceful protest to armed revolt against the Assad regime.

The reaction of the Bashar al-Assad regime to the events in Deraa was consistent with the reaction to opposition of President Bashar al-Assad's father, Hafez al-Assad, during the time he had been Syria's president.  For example, in the 1980s a splinter faction of the Muslim Brotherhood tried to rise up in arms against President Hafez al-Assad in the Syrian city of Hamaa.  President Hafez al-Assad responded with months of artillery shelling of Hamaa, which killed between 10,000 and 40,000 of the city's inhabitants.

As protests and fighting spread across Syria during 2011, the United States expressed sympathy for Syrians engaged in peaceful, anti-Assad protests.   U.S.

3

Ambassador to Syria Robert Ford attended several anti-regime protests, a clear signal of U.S. government support.  The regime responded by physically threatening the U.S. Embassy, and at one point withdrew security personnel from around the embassy and allowed pro-regime thugs to ransack the building.  The United States then withdrew its diplomats from Syria.  The United States has had no diplomatic or consular representation in Syria since 2011.

Arab Spring opposition to the Assad regime spanned all sectors of Syrian society.  One component of the anti-regime opposition was a specifically religious, Islamic opposition.  For a time following the U.S. invasion of Iraq, President Bashar al-Assad was able to neutralize the Islamic opposition within Syria by busing Islamic fighters over the border into Iraq, where they could fight Americans and their Iraqi allies.  Eventually some of these Islamic fighters returned from Iraq (or Lebanon, another place to which the Assad regime had sent them) to Syria.

## I. THE SYRIAN HISTORICAL AND CURRENT EVENTS CONTEXT OF THIS CASE.

### A. Abu Musab al-Zarqawi, the Origins of ISIL, and the Roots of ISIL's Extreme Violence

In 1999, Abu Musab al-Zarqawi was released from the Jordanian prison where he had been serving a sentence for support of a terrorist organization.  Shortly after his release from prison, Zarqawi traveled to Afghanistan, where he made contact with the senior leadership of al-Qaeda.  With $200,000 of al-Qaeda's money, and a plot of land donated by the Taliban, Zarqawi established a terrorist training camp in Afghanistan.  In 2000, Zarqawi and the organization he had founded attempted to perpetrate the "millennium

plot," which included attacks on the Radisson Hotel in Amman, and several other western hotels in Amman. The plot was foiled.

When the U.S. invaded Afghanistan following the attacks of September 11, 2001, Zarqawi fought for a short while, but then fled Afghanistan, going first to Iran, and then on to northern Iraq. Following the U.S. invasion of Iraq, Zarqawi and his organization conducted a campaign of bombings against the United States military and other targets, including the United Nations and the Jordanian embassy. At this time, Zarqawi did not have any official relations with al-Qaeda, but in late 2003 and on into 2004 Zarqawi reached out to al-Qaeda in an effort to have his organization and al-Qaeda work together. In May of 2004, Zarqawi conducted his first videotaped beheading, of U.S. hostage Nicholas Berg. Several months after this atrocity, in October of 2004, Zarqawi "made *baya*" (swore allegiance) to al-Qaeda. Zarqawi's organization took the name "al-Qaeda in Iraq," and became al-Qaeda's first international affiliate.

Zarqawi was ferociously anti-Shiah, and his organization in turn became deeply anti-Shiah. Zarqawi believed the Shiah had to be fought until they were all exterminated. Zarqawi dispatched his own father to carry out a suicide bombing at a Shiah shrine in the Shiah holy city of Qatib, in southern Iraq, which killed a Shiah ayatollah. Shiah were referred to by the insulting term "rafidi" which means "one who refuses," specifically, one who refuses to recognize the legitimacy of the line of succession from the prophet that is recognized by Sunni Islam. The Assad regime, although its top members are Alawites, gets support from Iran, the dominant Shiah power in the middle east, and opposition or

support for the Assad regime tends to fall along Shiah-Sunni lines, with Shiah in support of the regime, and Sunni in opposition to it.

Following the pledge of *baya*, tension between Zarqawi and al-Qaeda persisted, primarily over the issue of brutality and the killing of Muslims.  Zarqawi's bombing campaign in Iraq may have targeted non-Muslims, but the bombs were very powerful, were often detonated in public places, and as a result they killed many Muslims.  In Zarqawi's view, such deaths were acceptable, because Zarqawi believed Iraqi society needed to be thoroughly cleansed of all western and secular influences.  To al-Qaeda, however, Zarqawi's bombings were a catastrophe in terms of al-Qaeda's ability to maintain the support of ordinary Muslims.  There was an exchange of letters between al-Qaeda and Zarqawi over this issue, at the end of which al-Qaeda ordered Zarqaqi to be more discriminating in his bombing.  In response, Zarqawi's behavior, if anything, actually got worse.

Zarqawi was killed by American military action in June of 2006.  In October of 2006 one of his successors as the leader of al-Qaeda in Iraq renamed the organization "the Islamic State in Iraq."  After some years in which it was not clear whether the Islamic State in Iraq was or was not still part of al Qaeda, the two organizations formally split in 2013.

Before the split, in May through August of 2011, discussion began about opening a Syrian wing of the Islamic State in Iraq.  In August of 2011, seven senior members of the organization crossed into Syria, and activated a dormant network of safehouses in northeastern Syria.  In Syria, this group went by the name Jabhat al-Nusra, the "support group."  When the split between the Islamic State and al-Qaeda occurred in 2013, Jabhat

al-Nusra remained a part of al-Qaeda, while the Islamic State went on its own, independent path.

In June of 2014, abu Bakr al-Baghdadi, then leader of what had become the Islamic State in Iraq and the Levant, or "ISIL," mounted the steps of the pulpit in a mosque in Mosul, Iraq and proclaimed the re-establishment of a caliphate, a supreme Islamic religious and political entity that had a legitimate claim to the loyalty of every Muslim in the world.

### B. ISIL's Need for, and Recruitment of, Foreign Fighters

Several factors drove ISIL to need foreign fighters to fill its ranks.

First, as testified to by Mr. Lister, ISIL did not govern populations so much as it controlled them. Its theological rulings were bizzare (the sale of ice cream was forbidden because ice cream did not exist in the prophet's time, and the sale of cucumbers was forbidden because cucumbers were sexually suggestive, for example), and its punishments for even minor infractions were extraordinarily sadistic and carried out in public. ISIL could recruit from the local population only through fear, and as a result local recruits understandably tended not to be good fighters. Second, from August of 2013 until July of 2014, ISIL did not fight the Assad regime; instead, it waged war on other anti-regime opposition groups. Of the 7,000 people killed in combat by ISIL during the first six months of 2014, not one was an Assad regime soldier. At this same time, the Assad regime stopped fighting ISIL, probably because the regime recognized that ISIL was doing the regime's work for it. These facts made it impossible for ISIL to augment its numbers by allying with other opposition groups.

7

In response, ISIL recruited very heavily from abroad, relying on three different recruiting messages.

First, abu Bakr al-Baghdadi, in his role as caliph and leader of the faithful, claimed that it was the duty of all Muslims throughout the world to come and join the Islamic State, and to fight for that state.  Second, ISIL used its extreme brutality as a recruiting tool.  To do so, ISIL characterized its actions to a local audience as expressions of power and dominance over a Shiah-dominated Iraqi government, and to an international audience as an organization that was bringing power back to Sunni Islam by showing no mercy to the enemies of Sunni Islam.  To publicize its brutal acts, ISIL has proven very savvy at using electronic media.  As the evidence at trial showed, many ISIL propaganda videos were enthusiastically viewed by defendants in this case.

Third and finally, ISIL has adopted an apocalyptic ideology about the end times which places great value on dying as a martyr in Syria at this particular time in human history.  At the end of human history, ISIL preaches, Jesus will descend from heaven to the white minaret of the main mosque in Damascus, and from there will lead an army to the Syrian village of Dabiq, northeast of Aleppo, where the final battle between the forces of good and the forces of evil will be fought.  As Mr. Lister explained:

> . . . one of the reasons why ISIL has been so effective at recruiting so heavily from non-Syrian and Iraqi populations is because it has claimed to be operating in Syria within this broader mindset.  The idea that you can go and fight in Syria in order to contribute towards bringing about the end of the world is something that its ideology – its propaganda, sorry, has made very clear for a long time.  In fact, Dabiq was something that Abu Musab al-Zarqawi all the way back in the 2000s spoke about very clearly, our armies will one day reach Dabiq, and, you know, bring about the end of days.  So

8

it's a core tenet, it's a core principle of ISIL's belief.  And fundamentally, it's a core reason for why they wanted to operate in Syria all along.

When asked to link this ideology to the recruitment of a potential foreign fighter, Mr. Lister continued:

> I mean, generally speaking, there is a belief within these organizations that if you fight in the name of Allah, in the name of God, and you die as a martyr, you will automatically go to paradise.  I believe their understanding is that if you die in these battles, which ISIL claims to be bringing out the end of days, then you will obtain a, you know, a high place in paradise alongside God.  So the importance of fighting in Syria specifically, as I say, is of that utmost importance.

Finally, Mr. Lister pointed out in his testimony that some of the outrages perpetrated by ISIL, such as the beheadings of western hostages, were "trying to bait the west into intervening more," in order to precipitate the final battle between Muslims and non-believers.

As a result of all three factors, a vast majority of ISIL's forces at for example, the battle of Kobani, under the command of ISIL commander Omar al-Shishani, were foreigners, who sustained huge casualties.  Of note, the battle of Kobani pitted ISIL against Kurdish militia.  At no time, did the battle of Kobani involve combat between ISIL and Assad regime forces.

## II.    THE FACTS OF THIS CASE

The evidence at trial demonstrated the existence of a conspiracy among the defendants to travel to Syria via Turkey, cross the border into Syria, and there join, and fight for, ISIL.  There were three major efforts by the defendants to reach Syria, in the Spring of 2014, the Fall of 2014, and the Spring of 2015.

The Spring of 2014 effort had two components.  In one, defendant Guled Omar, together with Abdirahman Bashir (then a member of the conspiracy, later a cooperating human source for the FBI) and Yusuf Jama, attempted to drive to Mexico and travel onwards from Mexico to Turkey and then Syria.  In preparation for this attempt, defendant Omar withdrew $5,000 in cash using his federal student financial aid debit card.  Those funds were never repaid, and as a result of this financial behavior, defendant Omar was later found guilty of federal financial aid fraud, in violation of 20 U.S.C. § 1097.  The attempt at driving was thwarted by defendant Omar's family.  Later, however, on June 9, 2014, Yusuf Jama left the Twin Cities by Greyhound bus, traveled to New York City's John F. Kennedy International Airport (hereinafter "JFK"), and flew from there to Turkey and onwards to Syria.  Jama is believed to have later been killed in combat while fighting for ISIL and against Kurdish militia at the battle of Kobani.

The second component of the conspirators' Spring of 2014 effort involved cooperating defendant Abdullahi Yusuf's attempt to travel on May 28, 2014, and Abdi Nur's successful travel on May 29, 2014.  Yusuf was booked on an itinerary that would have taken him on the Russian airline Aeroflot from Minneapolis-Saint Paul to JFK, then on to Moscow, Russia, before taking an Aeroflot flight from Moscow to Istanbul.  However, when Yusuf applied for a passport on April 28, 2014, he aroused the suspicions of an alert passport specialist in the Minneapolis passport office.  The passport specialist relayed his suspicions to his supervisor, who told the FBI.  As a result, FBI Agents were waiting for Yusuf when he arrived at the Minneapolis – Saint Paul airport on May 28 to

catch his flight to JFK.  Yusuf was denied boarding, and after continuing to falsely claim to the FBI that he was going solo to Istanbul for vacation, sent home.

The Fall of 2014 effort also had two components. In the first, defendant Guled Ali Omar again tried to reach Mexico, this time by taking a flight from Minneapolis – Saint Paul to San Diego.  The FBI was told that defendant Omar had made a travel booking, and federal agents met Omar at the airport.  Omar arrived at the airport carrying no luggage, and in possession of his passport.  He was denied boarding and sent home.  After being turned away at the airport, defendant Omar telephoned defendant Hanad Musse, using "Magic Jack," an application that disguises one's telephone number. In that call, defendant Omar pleaded with defendant Musse to drop their own plans to travel to Syria.  In that telephone call, defendant Omar told defendant Musse that "I just got caught up."

The plans from which defendant Omar was trying to dissuade defendant Musse involved Musse and three other defendants – Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman – following the example of Yusuf Jama by taking Greyhound buses to JFK, and flying from there to various destinations in southeastern Europe, such as Athens, Istanbul, and Sofia, and then traveling on to Turkey and, ultimately, Syria.

Musse refused to drop the plans and "the JFK Four" continued to New York.  There, they were met by agents of the FBI and denied boarding.  Defendant Hamza Ahmed had boarded his flight, and was escorted off the aircraft by federal agents.  When three of the four were interviewed by the FBI in New York (defendant Hanad Musse left JFK without being interviewed; however, Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman were interviewed at JFK), they lied, claiming that they did not know each other, and that

11

they were all traveling to Europe, by themselves, for vacation.  In the case of defendant Mohamed Farah, this meant that he claimed to be traveling to Sofia, Bulgaria, in November, for a beach vacation lasting one day.  Upon return to Minnesota, each of the defendants was given a target letter from the U.S. Attorney's office, telling them they were targets of a federal criminal investigation into allegations of conspiracy to provide material support to a designated foreign terrorist organization.  The JFK Four were then again interviewed, this time by Minneapolis-based FBI agents.  They maintained the fictions they had given to the New York FBI agents. (Defendant Hanad Musse had not been interviewed in New York.)

Later in November of 2014, defendant Abdullahi Yusuf, who had been at liberty since trying to leave in late May, was arrested on a criminal complaint charging him., together with Abdi Nur, with conspiring to provide material support and resources to ISIL, and with actually providing material support and resources to ISIL (the material support and resources provided was the person of Abdi Nur).  In February of 2015, defendant Hamza Ahmed was arrested, and detained pending trial.  Defendant Ahmed was therefore unable to conspire with his codefendants when, in the Spring of 2015, they began conspiring yet again to go to Syria to join ISIL.

The failure of the Fall 2014 attempt did not lead the defendants to drop their ambitions to travel to Syria.  In the Spring of 2015, they again began planning to leave the United States, go to Turkey, then go onwards into Syria to join, and fight for, ISIL.  Shortly after this third and final round of plotting began, Abdirahman Bashir decided to cooperate

with the FBI's investigation.  He wore a recording device and recorded many hours of incriminating conversations between March and April of 2015.

The defendants had hoped to make a connection in Tijuana, Mexico, with a source for false passports.  When this plan could not be completed, because Abdi Nur, in Syria, was unable to connect with the Mexican ISIL fighters who were to provide the contact information in Tijuana, Bashir, with the approval of the FBI, stated that he had a source for false passports in San Diego.

On April 17, 2015, Bashir, together with defendants Mohamed Farah and Abdirahman Daud, left home in defendant Daud's Honda Civic, bound for San Diego. Upon arrival in San Diego on Sunday, April 19, defendants Daud and Farah were arrested at a warehouse in San Diego when they took possession of fake passports from "Miguel," a San Diego police officer who had been acting the part of a procurer of fake passports. The arrests in San Diego were followed within minutes by the arrests in Minnesota of the remaining defendants:  Guled Ali Omar, Adnan Abdihamid Farah, Zachariah Yusuf Abdirahman, and Hanad Mustofe Musse.